# Ala. Gt. Southern R. R. Co. *v.* South & North Ala. R. R. Co.

*Bill in Equity to enjoin Action at Law, and for Specific Performance of Contract for Right of Way and Railroad Crossing.*

1. *Decree pro confesso; conclusiveness and effect of.*—A decree *pro confesso* against a corporation, in a suit involving a contract made by its agents, is an admission of the allegations of the bill as to the validity of the contract, and as to the agent's authority to make it; and it is conclusive as to these matters, in a subsequent suit between the parties or their privies.

2. *Equitable estoppel; contract made by agents.*—A legal title in or to lands can not be created or acquired by or under a contract made by an agent, unless he acts under written authority (Code, § 2121); yet an equitable interest may be acquired under such contract, by conduct or declarations on the part of the principal which would create an estoppel *in pais* against him; and this principle is applicable to a private corporation, whose directors, or other governing body, may by their conduct estop it from disputing the authority of an agent to bind it by a contract, where the agent acted openly and notoriously, and the corporation acquiesced for a long time in his acts.

3. *Same.*—It is a rule of equity, supported by principles of justice as well as of public policy, that if the owner of land knowingly suffers another to purchase and spend money on it, under an erroneous opinion or mistaken belief of title, without making known his own claim, he can not afterwards assert in equity his right or title against such purchaser.

4. *Consideration of contract.*—A tripartite agreement between an incorporated land company and two railroad companies, whose tracks ran through its lands and crossed each other, by which the right of way and place of intersection are established, is supported by the two-fold consideration of benefit to one party and detriment to the other, when it appears that the railroad company seeking to avoid it acquired valuable rights under it, and that the other company had, in consequence of it, abandoned another crossing previously selected.

5. *Uncertainty in contract; contemporaneous construction of contract.*—Where the contract sought to be enforced providing for the right of way and intersection of two railroads, contains a stipulation that one company shall have the free use of the other's right of way, "in a manner to be hereafter determined by deed," but no deed is ever executed, the uncertainty and indefiniteness of the stipulation, if objectionable, is obviated by proof of the contemporaneous construction of the parties in execution of the contract, one being placed in possession of the right of way selected, and the other acquiescing in that possession, without objection, for more than nine years.

6. *Grant or contract by mortgagor in possession; statutory reservation as to railroad crossing.*—The general rule is, that a mortgagor in possession can make no grant of any part of the mortgaged property, nor other contract in relation to it, which will prejudice the rights of the mortgagee; but, under the statutory provisions regulating the indorsement

of railroad bonds by the State, and declaring its lien and priority (Rev. Code, §§ 1424–35), express provision is made for the intersection of roads which have received aid from the State, and this provision is an implied stipulation in every mortgage executed under the law; nor is it limited to an intersection at right angles, when, as in this case, the crossing is made in the boundaries of a prospectively large city, and a distance of four thousand feet is agreed on for the roads to approach and cross each other.

7.  *Compensation for right of way by railroad. under contract.*—In a contract between two railroad companies for the right of way, where the track of one crosses the other, a stipulation that it shall have "the perpetual and free use of the right of way" of the other, within the distance specified, not only contemplates its uninterrupted use, but also relieves it from the payment of compensation.

APPEAL from Jefferson Chancery Court.

Heard before Hon. THOMAS COBBS.

In 1881, the Alabama Great Southern Railroad Company brought a statutory action of ejectment against the South & North Alabama Railroad Company for the recovery of a certain strip of land therein described, extending through the city of Birmingham, being part of its right of way. This bill was filed for the purpose of enjoining that action and to obtain specific performance of the contract hereinafter set out.

Prior to the year 1871, the South & North Alabama Railroad Co., and the Alabama & Chattanooga Railroad Co., were engaged respectively in building railroads from Montgomery to Decatur, and from Chattanooga through the State of Alabama, into Meridian, Mississippi.   Both these roads received State aid, to-wit, the endorsement of their bonds by the State of Alabama.   These roads would naturally cross near Elyton, Jefferson County, Alabama.   Work was being done on both roads, prior to the year 1869.   The South & North Alabama Railroad Co. had graded and built its road, prior to April, 21, 1871, to the vicinity of the present site of the city of Birmingham, which was then an old field, through which the Alabama & Chattanooga Railroad Co. had already acquired a strip of land one hundred feet wide, for right of way, and built a track thereon.   At this time the Elyton Land Company owned the land on either side of this right of way, and about four thousand acres of land in and around it; upon which it intended to found a city, and the plan of which was to be laid off with reference to the crossing of the two roads.

In 1868, the said Alabama & Chattanooga Railroad Company executed and delivered to Seth Adams and others, trustees, a mortgage or deed of trust covering its entire property,

real, personal or mixed, which it then owned or might there-
after acquire for the purpose of securing certain bonds
which were afterwards, and before the happening of the
events which form the foundation of this suit, issued and
sold. In said instrument, there was recognized, confirmed
and conveyed the prior rights, liens, powers and privileges
of the State of Alabama in and upon all of such railroad's
property as provided for in the acts of the General As-
sembly of Alabama, approved respectively the 19th Febru-
ary, 1867, and the 22d September, 1868. This mortgage
was duly recorded in Jefferson county, in which are situate
the lands, the right of way over which is the subject of the
present controversy.

John C. Stanton, who was general superintendent of the
Alabama & Chattanooga Railroad, had entire charge of its
building and controlled the officers and agents engaged in
its construction, and acted for the company in the matter of
acquiring rights of way and land for depots and machine
shops. The best place for his road to be crossed by the
South & North Alabama Railroad was the subject of confer-
ence between the officers of the two companies. Their con-
ferences resulted in the following contract between said rail-
road companies and the Elyton Land Company on the *21st
day of April, 1871:*

"This contract or agreement made and entered into this
21st day of April, A. D. 1871, by and between the Elyton
Land Company, party of the first part, the Alabama & Chat-
tanooga Railroad Company, party of the second part, and the
South & North Alabama Railroad Company, party of the
third part—

WITNESSETH: That for and in consideration of the pay-
ment to the party of the first part of the sum of one dollar,
by the parties of second and third parts, receipt whereof is
hereby acknowledged, and for the further consideration of
their doing and performing the presents as hereinafter stip-
ulated and stated, the said party of the first part has this day
bargained, sold and conveyed, and by these presents do bargain,
sell and convey unto the parties of the second and third parts
jointly and severally, the following described tracts or par-
cels of land (here follows description of land); all for the
purpose and upon condition that they build, construct and
use thereon, their depots, machine-shops and tracks for the
use of themselves at said city of Birmingham, and upon the
further condition that they shall give, grant, sell and convey

unto the two first railroad corporations who construct their railroads through from their terminus to said city, an equal and sufficient quantity of the above granted premises, not exceeding one-quarter to each, for their depots, tracks, and machine-shops and other railroad purposes, and upon the further condition that a portion of said premises near the centre of the tracks and not less than four hundred and fifteen by nine hundred feet, be appropriated and used forever as a *general passenger depot* for each and every railroad ending in the city of Birmingham, with *right of way to the same*, and upon further condition, *that the party of the third part shall have the perpetual and free use of the right of way of the party of the second part in a manner hereafter to be described by deed;* and that the strip of thirty-five feet lying between the right of way of the party of the second part on each side of said railroad, &c., shall be held by the party of the first part forever as a perpetual right of way for all railroad companies doing business in and through said city as aforesaid." Then follows an agreement as to streets and to make to each of the parties deeds to their respective portions of the land as agreed upon between themselves. This paper was attested by witnesses and was signed:

J. R. Powell, President Elyton Land Company, R. C. McCalla, for Alabama & Chattanooga Railroad Company, subject to approval; approved, J. C. Stanton, General Superintendent; South & North Alabama Railroad Company, by John T. Milner, Engineer and Superintendent.

Shortly after this location was agreed upon, and the instrument signed, the South & North Alabama Railroad tracks were built, in the year 1871, in the manner they are now located, and have ever since been used. The situation of the tracks to be located on the right of way of the Alabama & Chattanooga Railroad, was designated by McCalla, the resident engineer of the A. & C. R. R. Co., who was acting for it, and who is shown to have authority from Stanton, who approved McCalla's action in the premises.

*In May, 1872,* Seth Adams, Francis B. Loomis, and *John C. Stanton,* who were then the *trustees* of the hereinbefore mentioned mortgage, filed a bill to foreclose that mortgage, as the Alabama & Chattanooga Railroad Company had failed to pay the interest therein provided for, and such proceedings were had thereon that *in 1877* the property covered by the mortgage was sold to John Swann, who conveyed it to the Alabama Great Southern Railroad Company, appellant.

The opinion sets out sufficiently the suit by the Elyton Land Company against appellant and appellee, based on the contract hereinbefore set out and in which a decree was rendered against appellant, the Ala. Gt. Southern R. R. Co.

In his final decree the chancellor granted the complainant, the South & North Alabama R. R. Co. the relief prayed; but further decreed that complainant pay compensation to the Ala. Gt. Southern R. R. Co. for said right of way, to be estimated by the value thereof at the time of its appropriation, and for any injury, caused by complainant's occupancy of said right of way, to the contiguous lands of defendant.

HOADLEY, JOHNSON & COLSTON, and TROY, TOMPKINS & LONDON, for appellant.—The principal defenses to the contract relied on by appellee are as follows: 1st, that John C. Stanton does not appear to have had any authority to execute said instrument, and neither the Alabama Great Southern Railroad Company, nor the Alabama & Chattanooga Railroad Company, has either ratified or taken any advantge whatever from it; 2d, that the contract is void under the statue of frauds, citing McKibbon v. Brown, 14 N. J. Eq. 13; 6 Ohio, 383; 46 Pa. St. 334; 56 Cal. 539; 3 A. K. Marsh. 400; 5 Munf. (Va.) 185; 40 Me. 130; 21 Ark. 533; 24 Wis. 190; 21 Mich. 491; 22 N. J. Eq. 85; 31 Mich. 380; 64 Ill. 343; 78 Ill. 48; 52 Ind. 125; 64 Ala. 193; 78 Ala. 88; 73 Ala. 426. 3. The contract is too vague and indefinite in its terms to authorize its specific performance.—7 Port. 73; 57 Ala. 625; 59 Ala. 591; 51 Ala. 312; 73 Ala. 75; 1 Russ. & M. 116; 72 Ala. 79; 75 Ala. 475. 4. There is no consideration for the contract.—1 Story Eq. Jur. § 762; 71 Ala. 98; 72 Ala. 467; 12 Ala. 124; 27 Ala. 184; 34 Ala. 633. 5. The Alabama Great Southern Railroad Company holds under title paramount, and is not affected by this contract.—38 Pa. St. 76; 50 Me. 106; 9 Humph. 568; 5 Allen, 319; 1 Wall. 254; 11 Wall. 459; 12 Wall. 362; 10 Ohio St. 404; 4 Allen, 80; 107 Mass. 34; 12 Bush, 711; 76 Ill. 122; 8 C. & P. 566; 58 Ill. 210.

THOS. G. JONES, contra.—We submit that appellee is unquestionably entitled to an affirmance of the decree, for the following reasons: 1st. The parties having located the tracks, and by cotemporaneous construction and usage having fixed the manner of the use, and the appellee having done all that was required of it, the contract must be spe-

[Ala. Gt. Southern R. R. Co. v. South & North Ala. R. R. Co.]

cifically enforced, if fair, and based on adequate considera-
tion. 2d. The consideration parted with by appellee and
received by appellant was valuable, consisting of a surrender
of a right to cross elsewhere, and crossing in a manner bene-
ficial to appellant, and the further action jointly with it to
obtain and the obtaining of valuable rights from the land
company; and was highly beneficial to all interested in the
A. & C. corporation, for all time. 3d. The contract under
which bondholders claim, contemplates that the A. & C.
should remain in possession and do all things needful to
bring and keep the enterprise in successful operation; one of
the inevitable incidents of which is agreement with other
roads as to crossing and union. 4th. In making such agree-
ment the A. & C. Railroad Co. officials were the authority
ordained by law to represent the State and the corporation;
and its bondholders, no matter what the date of their mort-
gage, are bound by any reasonable exercise of such author-
ity. 5th. The law, under which the bondholders claim, ex-
acted as one of the considerations for State aid that the A.
& C. should grant the right to cross and unite with it. So
much of the right of way as the authorities in charge judged
was proper for this purpose, was necessarily excepted from
the appellant's mortgage; and the right to such use is coeval
with the bondholder's rights, and from its very nature para-
mount to them. 6th. The A. & C. road and its bondholders
are bound for all these reasons; and besides, are estopped by
the decree in the land company suit from disputing the au-
thority to make the contract, or to deny that they claimed
under it. 7th. The mortgage expressly excepted from its
operation any lands not necessary, etc. The recording of
the mortgage was not an assertion that the right of way here
involved was necessary to the operation of the road; and the
A. & C. acting on the contrary view, and appellee expending
money on the faith of it, and becoming environed with diffi-
culties, to the knowledge of the bondholders, their long ac-
quiescence and silence, is conduct inducing an "erroneous
opinion of the title," and *their mere silence* of itself will es-
top them. 8th. The arrangement here involved being one
that must necessarily be made, whether the road was mort-
gaged or not, and which appellee had a *right* to insist on be-
ing settled by some one, and the bondholders not having
provided any one to deal with, if they had authority in the
premises, and those in charge of the road, being the persons
to whom application must be made, good faith and fair deal-

ing required the bondholders, if they had a right to object, to speak out in a reasonable time, after knowledge or being charged with notice, and before it was too late for appellee to withdraw without irreparable injury. 9th. The bondholders never had any right to object to the *use* of the mortgaged right of way for crossing and union. Their right, if any, was confined to objecting to an *unreasonable* mode of the use only. If they acquiesce for years in the *manner*, to the prejudice of one who makes such *use*, they are estopped from objecting afterwards. 10th. Appellee was not a party to the A. & C. foreclosure proceedings, and in no wise bound by the decree; and Swann's deed expressly implies that it does not imply "any covenant." As far as appellant's rights are concerned the foreclosure added nothing to them; for they took with notice of appellee's equities. 11th. As "purchasers" merely, they took with notice of all appellee's rights and equities, and under a virtual quit-claim deed. As bondholders merely, they stand in the attitude of acquiescence for nine years. If they stand in the shoes of the State, and it could object, they stand in the shoes of one who has ratified and approved the contract. Besides, the State not acting in this matter in its sovereign capacity, but in its private character, its acquiescence has the same effect as that of ordinary persons; and it is also bound by the acts of its agent, the A. & C. Co. 12th. A court of equity having jurisdiction of the main case, can adjust all the incidents, including compensation. Besides, appellant had no right to compensation; and can not complain of the mode of getting something it is not entitled to. 13th. This is not the case of a mere purchaser from the mortgagor, with notice of the mortgage, of an estate which must terminate with the foreclosure. It was a contract as to the exercise of *right* which appellee had in the right of way, regardless of, and paramount to the mortgage; made with one authorized to contract in reason about it; and was beneficial to the mortgaged estate, and the *statu quo* can not be restored. 14th. The arrangement was with reference to a permanent and valuable benefit to the mortgaged property, and the bondholders acquiesce for nine years in the act of those in charge of the trust, whereby appellee was *induced not* to *condemn* at all, and not to *condemn* at a place where it could condemn and would otherwise have gone; and now the bondholders claim that appellee can not condemn or use the place where it was induced to go, but must condemn *another* route through the heart of a growing city; whereby

appellee will be damaged a hundred fold in money, to say nothing of ruin to its business, and inconvenience in the use of property bought with reference to the agreement, and the bondholders still retain the benefit of the crossing thus induced, and it is impossible for appellee to retrieve its steps or save itself. Citing as authorities *Meyer Bros. v. Mitchell*, 75 Ala. 475; 14 Ala. 263; 30 Ala. 599; 54 Ala. 251; 79 Ala. 330; 67 Ala. 253; 10 Wall. 600; 51 Amer. Rep. 738; 75 N. Y. 601; 26 Mich. 73; 12 Wheaton, 89; 29 Ala. 221; 68 Ala. 229; *Ib.* 453; 1 Woods Railway Law, 440; 86 N. Y. 200; 12 Wall. 361; 23 How. 381; 60 Penn. St. 290; 91 U. S. 593; 78 N. Y. 187; 10 Ala. 755; 68 Ala. 170; 1 Ala. 406; 20 Ala. 798; 26 Ala. 504; 78 Penn. St. 391.

SOMERVILLE, J.—The contract of April 21st, 1871, purporting to have been executed between the Elyton Land Company, the Alabama and Chattanooga Railroad Company, and the South and North Alabama Railroad Company, has an important bearing on the issues in this cause, and we, therefore, first consider the objections urged by the appellant in opposition to its validity.

It is urged, in the first place, that this contract was executed by certain officers of the Alabama and Chattanooga Railroad Company without the written authority of that Company, and was never afterwards ratified by its board of directors or other governing body. These officers were R. C. McCalla, chief engineer, and John C. Stanton, general superintendent of the road. The contract concerns the use of the right of way of a railroad company, which is an interest in lands, and an agent who conveys such property is required by our Statute of Frauds to have "a written authority."—Code, 1876, § 2145. If the legal title were in controversy it is evident that the best and only evidence of such agent's authority to convey would be a resolution of the board of directors, appearing among the corporate proceedings or minutes, showing the appointment of such agent, and investing him with the requisite authority to convey. *Standifer v. Swann*, 78 Ala. 88. But such, as we shall see, is not this case, it being admitted by the appellee that the appellant has the legal title to the right of way in controversy, and that the claim of the appellee can not rise to a higher dignity than a perfect equity.

There are, in our opinion, two sufficient answers to the argument that neither Stanton nor McCalla is shown to have

37

been invested with a written authority to convey the property in controversy. The first is found in the legal effect of the decree rendered in favor of the Elyton Land Company in August, 1881, against the appellant, and the appellee, involving this same contract. The bill filed in that suit alleged in substance the existence of this contract, and its execution by authority of the Alabama and Chattanooga Railroad Company, and sought to have the benefits of it revoked as against the appellant, the Alabama Great Southern Railroad Company, for non-performance of certain conditions subsequent, the latter company being averred to claim under this contract as the successors of the former. The decree *pro confesso* taken in that case against the appellant involved an admission by it of the allegations of the bill.—Code, 1876, § 3824. The record would be admissible evidence even in favor of a stranger, as a solemn admission by the appellant of the existence of the contract, of the fact of its claiming under the provisions of it, and of the authority of the officers by whom it was executed.—1 Greenl. Ev. § 527a. *A fortiori* would it be admissible in favor of the appellee who was a party to the record as a co-defendant in the suit.

A further and equally cogent reason is found in the principle of equitable estoppel, or estoppel *in pais*, which, we think, arises out of the facts of this case. The case of *Standifer v. Swann*, 78 Ala. 88, *supra*, relied on by appellant's counsel, does not go farther than to hold that no legal title would pass, under the facts of that case, by the deed of Stanton, whatever equities the vendee might have, which were not considered.—*Ware v. Swann*, 79 Ala. 333; *Swann v. Miller*, 82 Ala. 530. The contrary doctrine is well settled in this State, that, notwithstanding the requirements of the Statute of Frauds, declaring void certain contracts for the sale of land unless evidenced by writing subscribed by the party to be charged, an equitable interest may be acquired in lands, without any written transfer of title, by conduct or declaration of the owner which would create an estoppel *in pais* on his part.—*Hendricks v. Kelly*, 64 Ala. 388; s. c. 57 Ala. 193; *McPherson v. Walers*, 16 Ala. 714. This rule applies as well to corporations as to natural persons. The fact that they must necessarily act through the instrumentality of agents, either immediate or intermediate, and can act in no other way, does not change the principle. And although an agent of a railroad, or other corporation, authorized to sell land or any interest in land, can convey no legal

title or freehold estate unless his authority to sell be in writing, this being a question of actual authority, yet the directors or governing body may so act as to estop themselves from denying the existence of such written authority, and thus create an equitable estoppel *in pais.*—1 Rorer on Railroads, pp. 652–665; *V. & M. R. R. Co. v. Ragsdale,* 54 Miss, 200; s. c. 17 Amer. R'y Rep. 435.

The general rule is that agents of a corporation, except for the sale or alienation of land, need not be appointed by a vote of the directors, or in writing.   Nor need such appointment usually be evidenced by the corporate proceedings or minutes.   Both the fact of the appointment and the authority of the agent may be inferred from his being held out to the public as apparently invested with such authority, or from the subsequent recognition or confirmation of his acts, whether originally authorized or not.—1 Wood's Railway Law, pp. 444–447, § 163; *Ala. & Tenn. R. R. Co. v. Kidd,* 29 Ala. 221; Angell & Ames on Corp. § 284.   If the act done by the agent be one of so public and notorious a character as that ignorance of it would be gross negligence on the part of the principal, the inference is the stronger that it must have been known to the principal, and that his failure to expressly dissent in a reasonable time is a ratification of the act, especially where the principal derives a benefit from it.

The testimony shows that John C. Stanton was the general superintendent of the Alabama and Chattanooga Railroad Company, and that R. C. McCalla was its chief engineer. The contract in question was signed by them both.   Its purpose was to provide for depot facilities and locations for machine shops, with rights of way through a space agreed on for the crossing of two great and important railways—the site of a future prosperous city; and to secure to one of the roads, then in progress of construction, a suitable and convenient place of crossing.   It is shown that Stanton had been intrusted with full power to build the road, equip, manage, and run it, as its general superintendent, exercising authority over all intermediate agents.   There was no other person representing the company who had any authority of a cognate character.   He was exercising this power so notoriously and openly that it would be gross negligence for the directors to be ignorant of his conduct.   The presumption is that they knew what he was doing incident to the customary duties of his position,   It may be regarded as matter of

common knowledge that such powers are usually exercised by such officers, as necessary to the continued life and existence of the company.—1 Wood's Railway Law, p. 439-440, § 162. The failure of the company, moreover, to object to the open and notorious occupany of the right of way for nearly nine years, under the terms of the contract, is persuasive to show the conferring of original authority, or else the ratification of the act of their agent in making it. The existence of this authority is also corroborated, if it is not, as we have above said, established solely by the decree *pro confesso* in favor of the Elyton Land Company rendered against appellants on issues growing out of this same written agreement.

The inference thus being that this authority was conferred, although it may have been oral, and its exercise being so long acquiesced in, and the appellee, the South & North Alabama Railroad Company, having, as it appears, located its machine-shops, tracks and depots with a view to the right of way acquired under this contract, and the land in controversy, as so occupied by it, having risen in value perhaps a hundred fold, it would be inequitable and unconscientious to allow these affirmations of the agent's authority now to be denied or disproved. It is a sound and honest rule of equity, supported by principles of justice as well as of public policy, that if one knowingly though passively suffers another to purchase and spend money on land, under circumstances which induce an erroneous opinion or mistaken belief of title, without making known his claim, he shall not afterwards, in a court of conscience at least, be permitted to successfully assert any right or title against the purchaser.—*Hatch v. Kimball*, 16 Me. 146; *Marshall v. Pierce*, 12 N. H. 136; *Wendell v. VanRenssalaer*, 1 Johns. Ch. 354; *Blake v. Davis*, 20 Ohio 231. The facts of this case, it seems to us, fall within this rule, and if they do not constitute an estoppel *in pais* the whole doctrine might as well be blotted from our system of jurisprudence.

It is further urged that the contract in question is not supported by any sufficient legal consideration. The agreement is tripartite, between the Elyton Land Company and the two railroad companies. The rights conferred by the land company upon the appellant, and the abandonment by the appellee of another crossing which had been determined on, would be a sufficient consideration, the first being bene-

ficial to the appellant and the latter being detrimental to the appellee.

The uncertainty of the contract is also urged as a reason why it shall not be enforced. This feature is supposed to be found in the provision that "the party of the third part shall have the perpetual and free use of the right of way of the party of the second part *in a manner to be hereafter determined by deed.*" This, it is said, left open for future adjustment one or more important terms of the contract, and no such deed has ever been executed. The appellee was, however, placed in possession of the right of way of appellant, and has continued in its daily use for over nine consecutive years, with the knowledge of the appellant and those under whom it derives title. The conduct of the parties, and uniform usage, thus acquiesced in, has supplemented this alleged uncertainty. The failure on the part of the Alabama & Chattanooga Railroad Company to require a deed of the character stipulated for, followed by a dissolution of that corporation, and the acquiescence for so long a time in the mode of use adopted by the appellee, must be deemed a waiver of this feature of the contract, as well as an agreed interpretation of it. This is an identification of the thing contracted for, so far as qualified by its mode of use, not by declarations but by the acts of the parties, which can be proved by parol evidence. In fact it is both a construction, and an execution of the contract as to the only clause of it open to the charge of uncertainty.

The last objection relied on is the fact that the appellant claims title under a mortgage, or deed of trust executed by the Alabama & Chattanooga Railroad Company to the State in December, 1868, several years prior in point of time to the contract in question, which was not made until April, 1871, and that, for this reason, its title is paramount to that of the appellee. The argument is that the railroad, being a mortgagor in possession, could make no contract disposing of any portion of its right of way, which was subject to the incumbrance of the mortgage. This may be admitted to be the ordinary rule governing the rights of the mortgagor and mortgagee of property, whether real or personal. Being the owner of the equity of redemption only, the exceptions are rare in which the mortgagor can confer on another any greater rights than those which he possesses. Nor usually would the silence of the mortgagee in standing by and permitting a purchaser from the mortgagor, having notice of

the mortgage, to put valuable improvements on the property, estop him from asserting his prior claim under the mortgage. Without deciding this point we may hypothetically admit its correctness.—1 Jones on Mort., § 681; *Steele v. Adams*, 21 Ala. 534; *Booraem v. Wood*, 27 N. J. Eq. 371; *Frost v. Beekman*, 1 Johns. Ch. 288.

But the proposition urged by the appellee as an answer to this is, that the right of the two railroads to make the crossing, and therefore to appropriate to such purpose a reasonably convenient portion of each others right of way, is paramount to the mortgage, or any other lien under which appellant claims. This mortgage, or deed of trust, was executed in the year 1868, and the bonds secured by it were issued under the provisions of the act of February 19th, 1867, incorporated in the Revised Code of 1867, as sections 1417 to 1439, inclusive, authorizing the indorsement by the Governor, in the name of the State, of the first mortgage bonds of certain railroads. The making of such indorsement secured to the State a first lien upon the road with all its property and equipments including its right of way. Rev. Code, 1867, § 1624. It is under a foreclosure of this lien, as well as of the mortgage executed to certain trustees to secure these bonds that the appellant claims title.

The inquiry is, did the law, which authorized this indorsement, and secured this lien, make a reservation of the right of way for crossing and union purposes, such as would cover the present case? It is contended that section 1435 of the Revised Code, which constituted a portion of that law, accomplishes this end. That section, so far as germane to this inquiry, reads as follows:

"The railroad companies receiving the benefits of this article, and all other railroad companies incorporated in this State, may construct their roads *so as to cross each other* if necessary, by the main track or branches, or *unite with each other* or the branches of each."—Rev. Code, § 1435.

This provision being in the law which authorized the indorsement of the bonds was a part of the contract of indorsement, and the acceptance of the benefits of the law by the railroad company made it as binding on all parties concerned as if it had been specially incorporated in the contract. And all persons dealing with the bonds were charged with notice of the law under which they were issued.—*Morton v. N. O. & S. Railway Co.*, 79 Ala. 590. The company thus, by consent of the State, of the bondholders and mortgagees, ex-

cepted from any lien or conveyance so much of its right of way as was necessary and convenient to make a crossing or union with the South & North Alabama railroad or any other railroad in Alabama, and dedicated it to the use designated by the statute.    This provision was a wise and necessary one in view of the fact, that, without its incorporation in the statute, it would have been practically impossible for the managers of railroads, encumbered by mortgages, ever to have made any contract for crossing which would have been binding on bondholders, many of whom would be unknown, and others subject to the disabilities of coverture, infancy, or of being *non compos*, so that they could not bind themselves.    The details of such an arrangement were necessarily devolved by implication upon the managing authorities of each road, subject only to the limitation that it should be made in a *bona fide* and reasonable exercise of the authority conferred.    To this every one concerned must be conclusively held to have assented.

The record presents nothing which justifies the conclusion that the right of way granted to the appellee was not of this character.    The contention of the appellant that the statute limited the right of crossing to a perpendicular crossing, and not to one in any degree longitudinal, can not, in our judgment, be sustained.    The statute must have intended to require imperatively a crossing at right angles, or else it permits one intersecting at an acute angle.    It would be a strict and unreasonable construction to hold that no discretion should be allowed in regulating such an arrangement.    Nor can any rule be stated by which to determine the exact size of the angle.    We might well say that in an open plain, where no marsh, river, mountain, or declivity intervened, that an intersection at such an angle as to occupy ten miles of track would be unreasonable, while the occupancy of a few hundred yards might not be.    The argument is manifestly unsound that places on the same basis these two categories. The power to do an act means the power to do it in a mode that is just, reasonable and satisfactory, taking into consideration the peculiar circumstances of each case.    It is here shown that about four thousand feet, less than a mile, of the appellant's track was appropriated for the purpose of a crossing of the two railroads.    The circumstances of the case were peculiar.    It was no ordinary crossing.    It was reasonably contemplated that the site would be occupied by a large and prosperous city in the future, a plat of which, with its appropriate

streets, avenues, and dedication to public uses, had already been surveyed and mapped out. It was reasonable to expect that such a city would embrace within its limits this mile of highway. It would be convenient to the public, as well as mutually to both roads, to have the tracks adjacent for this particular distance. It would lessen the frequency and hazard of crossing the track with vehicles of all kinds; and would greatly facilitate the interchange of both freight and passenger cars passing from one road to the other in the process of transportation, especially when accomplished by protracted switching so often necessary in such cases, and growing more dangerous with the daily increasing density of a growing city's population. These reasons satisfy us that the contract of April 21, 1871, under which the appellee is shown to have occupied the four thousand feet of the right of way of the Alabama & Chattanooga Railroad Company was authorized by law, and was binding on all persons concerned, including the appellant. Section 1424 of the Revised Code, 1867, which confers the priority of lien on the State, does not conflict with the foregoing views in the least. The section under discussion (§ 1435) excepts from the operation of this lien, as we have said, so much of the right of way as may be necessary or proper for a crossing with other roads. The case of *The Illinois Central Railroad Co. v. The Chicago, Burlington & Northern R. R. Co.*, but recently decided by the Supreme Court of Illinois, is, in our opinion, perfectly reconcilable with these views. It was there held that under the facts of that case, one railroad had no authority, in exercising the right of crossing, to condemn under the statute a crossing which had appropriated ten miles of another's railroad track, which had already been condemned as a public highway. That conclusion was probably correct, although two of the judges dissented.—*Anniston & C. R. R. Co. v. Jacksonville, etc., R. R. Co.*, 82 Ala. 297.

That the contract in question conferred the use of the right of way free from future pecuniary compensation seems to us quite clear. The right conferred is the "perpetual and *free use* of the right of way" in question. The consideration for this grant was given both by the Elyton Land Company and the appellee, as we have heretofore shown. Its use by the appellee was of great advantage to the other road. The word *free* must here be construed to mean free of compensation, not merely uninterrupted use, as insisted by appellant's counsel. This construction is corroborated by the

[Rooney et al. v. Michael & Lyons et al.]

fact that no compensation was ever claimed for such use, until the bringing of the action of ejectment sought to be enjoined by the present bill—a period of more than nine years from the making of the contract.

It results from the foregoing views that there is no error in the decree of the chancellor of which appellant can complain. The compensation required by the decree to be paid for the land, if erroneous, was error without injury.

The decree is affirmed.

CLOPTON, J., not sitting.

