## Lilla L. Taylor *et al.* v. Daniel Ladd *et al.*

Compromise — *Validity* — *Impeachment* — *Equitable Estoppel.* L. died, leaving three children as his only heirs. Several years before, under a parol agreement, his son D. left a profitable position in another state and joined the father in the purchase of a farm, the son, D., contributing the greater part of the consideration. It was stipulated that D. should provide the father and mother a home, with suitable food and clothing, and care for them during their lives, in consideration of which the entire interest in the land should then become the property of D. The mother died soon afterward, and the provisions of the agreement were substantially complied with by D. Prior to the father's death, and when his mind was not sound, he conveyed his interest in the land to D. The agreement between the father and D. was known to the other children. After the father's death a daughter claimed a share of the land, and a dispute arose as to the proper division of the estate. A compromise was effected, by which D. agreed to pay her much more than her share of the personal estate, when she deliberately made a writing acknowledging the payment made to be her share of her deceased father's property, both real and personal; and settlement was made with the other heir upon substantially the same basis. Afterward, and for a period of 10 years, the parties treated the settlement as effective and binding, and D. held possession of the land and made extensive and valuable improvements thereon, with the knowledge of the other heirs, and without objection or protest, when an action was begun by the daughter, claiming a share in the land. *Held,* That her declarations and acts, as well as those of the other heirs, constitute an equitable estoppel, which precludes the reopening of the settlement or the assertion by them of any interest or right in the land.

### *Error from Clay District Court.*

On August 21, 1889, *Lilla L. Taylor* commenced an action against *Daniel Ladd* and Mary Ladd, his wife, together with Agnes M. Ladd and Vinnie G. Ladd, for partition of a quarter section of land in Clay county, and for the rents and profits of the same for about 10 years. She alleged that in May, 1879, Moses Ladd died intestate, leaving as his sole surviving heirs Lilla L. Taylor, Daniel Ladd, and Harrison Ladd, children of the deceased; that since the death of Moses Ladd Harrison Ladd died, leaving as his heirs Agnes M.

Ladd, his widow, and Vinnie G. Ladd, a daughter; that at the time of the death of Moses Ladd, he was the owner and entitled to the possession of an undivided one-half interest in the northeast quarter of section 20, township 8 south, of range 4, situate in Clay county; that on March 4, 1879, Moses Ladd was old, infirm, and *non compos mentis*, and that while he was in this condition Daniel Ladd fraudulently obtained from him a conveyance of the land to himself, without the payment of any consideration therefor. Judgment was asked decreeing that plaintiff was entitled to an undivided one-third of the premises, and that Agnes M. and Vinnie G. Ladd have an undivided one-sixth interest each in the premises, as the heirs of Harrison Ladd, and that Daniel Ladd be decreed to have an undivided one-third interest therein. An accounting was asked, requiring Daniel Ladd, who had been in the possession of the land, to pay rents and profits at the rate of $500 per annum from 1879 to the commencement of the action.

In a separate answer of Daniel Ladd's, he set forth that, in the year 1871, in the state of Pennsylvania, he entered into a contract with his father, Moses Ladd, by the terms of which it was agreed that Daniel Ladd, who was a mechanic, should give up his occupation, at which he was earning about $7 per day, and remove with Moses Ladd to Kansas, where they would jointly purchase a farm, upon which Moses Ladd should have a home for the remainder of his natural life, and that if Daniel Ladd should provide his father with food and clothing during the remainder of his life, Moses Ladd agreed that at his death all his interest in the real estate jointly purchased should become the property of Daniel Ladd. In pursuance of this contract, they came to Kansas in the fall of 1871, and purchased the land in question for the consideration of $2,000, of which Daniel Ladd paid $1,-200, and Moses Ladd $800. After the purchase of the land the contract was twice modified, but in 1875 it was renewed in substantially the same terms. It is further alleged that, in pursuance of the agreement, Daniel and his father occupied the premises jointly until the death of Moses Ladd, in

April, 1879, and that Daniel at all times lived up to and faithfully performed the contract on his part, by furnishing his father with a comfortable home, food and clothing, and all the necessaries of life, until the time of his death. It is then averred that, on March 4, 1879, a deed was executed by Moses Ladd to Daniel, conveying the undivided interest of Moses Ladd in the premises to Daniel, with a view of carrying out the provisions of the agreement, and that at the time of the conveyance Moses Ladd was of sound mind. Another defense is set forth, to the effect that at the death of Moses Ladd he was possessed of $600 in money, with other personal property not to exceed $25; that he had no other property of any kind, except a claim for $135 against the plaintiff Lilla L. Taylor, for money loaned to her shortly before his death, and that, at the time, he was indebted to the defendant in the sum of $1,100, for which Daniel Ladd held the notes of Moses; that, notwithstanding the indebtedness, Daniel Ladd, in pursuance of a wish expressed by his father prior to his death, that the sum of $600 should be divided equally between his daughter, Lilla, and his son Harrison, paid Lilla the sum of $300 on April 26. It is further alleged, that Lilla Taylor was living in the neighborhood with Daniel Ladd, and knew of the contract between him and his father, and that, as a compromise and settlement, she accepted $300 in money in voluntary settlement of all claims which she might have against the estate, and at the same time she and her husband executed the following document:

"CLAY COUNTY, GRANT TWP., April 26, 1879. We, the undersigned, acknowledge receiving from Daniel Ladd $300, being our share of our deceased father's property, both real and personal.                    LILLA TAYLOR.
"Witness:  MARY F. DAVIES.     GEORGE TAYLOR.
            SAMUEL DAVIES.
"Signed before me, SAMUEL DAVIES,
            *Justice of the Peace, Clay County, Grant Township.*"

There is a further averment that at the time of the death of Moses Ladd the premises in question were but slightly improved, and that since that time Daniel Ladd has, in good

faith, and believing himself to be the sole owner thereof, expended about $5,000 in making permanent improvements upon the property.

The defendants Agnes M. and Vinnie G. Ladd filed an answer simply admitting the truth of the allegations of the plaintiff's petition, and asking to have their shares set off to them in accordance with the prayer of the petition. At the trial, a jury was called, to whom were submitted special questions of fact, which, with the answers returned, are as follows:

"1. Did Moses Ladd, on the 4th day of March, 1879, at the time he executed a deed for the land in controversy to the defendant Daniel Ladd, have possession of his reason so as to know the character and effect of the act he then performed? Ans. No.

"2. If you answer the first question 'no,' then did the defendant Daniel Ladd, at the time said deed was executed, know that Moses Ladd did not then have possession of his reason so as to know the character and effect of the act he then performed? A. Yes.

"3. If you answer the first question 'no,' then did defendant Daniel Ladd obtain from Moses Ladd the deed to the land in controversy on the 4th day of March, 1879, by fraud and undue influence? A. Yes.

"4. Before the 4th day of March, 1879, and at a time or times when Moses Ladd was of sound mind, had he agreed for a valuable consideration to convey the land in controversy to Daniel Ladd, or had he for such consideration agreed that said land should be the property of the said Daniel Ladd after his death? A. Yes.

"5. If you answer the last question in the affirmative, then did Daniel Ladd comply with all the conditions of such agreement on his part? A. No.

"6. Did the plaintiff have knowledge of such agreement between Moses Ladd and Daniel Ladd prior to signing the receipt set out in the third defense of answer of Daniel Ladd, on the 26th day of April, 1879? A. Yes.

"7. When did the plaintiff first learn of the execution of the deed for the land in controversy, executed by Moses Ladd to Daniel Ladd on the 4th day of March, 1879? A. April 25, 1879.

"8. Did the plaintiff, on the 26th day of April, 1879, when she signed the receipt which has been offered in evidence, a copy of which is set out in the third defense of the answer of Daniel Ladd, know that it referred by its words to real as well as personal property? A. Yes."

The court in effect set aside the fifth finding of fact, and, upon the testimony, found "that the defendant Daniel Ladd substantially complied with the contract made by him as alleged in his answer filed in this action, and found by the fourth finding of fact." The court further found and held, that the plaintiff Lilla L. Taylor has no interest in or title to the land in controversy, and no right to have the same partitioned, and that the action ought to be dismissed as to the defendants Agnes M. and Vinnie G. Ladd without prejudice. Judgment was accordingly entered. Upon these rulings errors are assigned.

*Anthony & Stackpole*, for plaintiffs in error:

If apt words had been used in the receipt to show that the plaintiff had sold to the defendant personal estate, real estate, or both, and the consideration paid for the real estate, with a description of the same, was contained therein, then we will admit that this paper would be a contract, and estop the plaintiff. But we insist that this paper is what it purports to be —a mere receipt, and not a contract. But let us treat it as a contract to sell, quitclaim or dispose of all her interest in land; still, as a contract, it could not have the effect of an equitable estoppel. See *Carithers v. Weaver*, 7 Kas. 125; *Palmer v. Meiners*, 17 id. 483; *Brewster v. Madden*, 15 id. 249; *Bernstein v. Smith*, 10 id. 69; *Clark v. Coolidge*, 8 id. 189.

If this receipt be regarded, and was treated by the parties as a contract, is it a valid contract, under the statute of frauds? We think not. We claim that the receipt in this case is insufficient to transfer any interest in land: First, because it does not show that the plaintiff sold any land to defendant; second, it does not show that the defendant bought any land

of plaintiff; third, it does not show any price paid for land independent of the personal estate; fourth, it does not describe any land. Under the statute of frauds, while the form of the memorandum of agreement is not material, it must state the contract with reasonable certainty, so that the substance can be made to appear and be understood from the writing itself, or by direct reference to some extrinsic instrument or writing, without having recourse to parol proof. *Reed v. Kenworthy,* 25 Kas. 701. See, also, *Williams v. Morris,* 95 U. S. 360; *Hollis v. Burgess,* 37 Kas. 487.

*Harkness & Godard,* and *F. B. Dawes,* for defendants in error:

The question is, whether a compromise and settlement thus deliberately made and entered into and evidenced by a written instrument, executed in the presence of a judicial officer and two subscribing witnesses, can, after the same has been acquiesced in for years, and large sums expended upon the strength of it, be set aside and held for naught, or whether the parties shall be held to their contract.

Inasmuch as the jury has found that Moses Ladd was insane at the time he executed the deed to Daniel Ladd, we shall not discuss that branch of the case. Even though it should be conceded that Daniel Ladd sought to obtain his own by an improper method — that is, by obtaining a deed from his father at a time when he was incapacitated from making a valid deed — it would not preclude him from enforcing and securing his just rights, at a proper time and in a proper and legal manner. It cannot be claimed that Lilla L. Taylor made the settlement because of such deed, because she claimed at the time that her father was insane, and that the deed was void. In support of our claims, we submit the following authorities: *Faxon v. Faxon,* 28 Mich. 158; *Chambers v. Chambers,* 6 S. Rep. 659; *Gormly's Appeal,* 18 Atl. Rep. 727; *Brands v. DeWitt,* 44 N. J. Eq. 545; *Railroad Co. v. Railroad Co.,* 5 Am. Rep. 401; *Taft v. Taft,* 41 N. W. Rep. 481; *Yeamans v. James,* 29 Kas. 373; *Newkirk v. Mar-*

*shall*, 35 id. 77; *Stapleton v. King*, 33 Iowa, 28; *Fuller v. Crittenden*, 9 Conn. 401.

A release of all demands cannot be varied by parol evidence to show that a particular debt was not intended to be released. *Pierson v. Hooker*, 9 Johns. 68; Herman, Estop., p. 927, § 800.

The opinion of the court was delivered by

JOHNSTON, J.: In 1871, Moses Ladd induced his son Daniel to leave a highly-remunerative position in Pennsylvania and accompany him to Kansas, where he desired to obtain and reside upon a farm. It was agreed between them that the father and son should jointly purchase a farm upon which the father and mother might reside during the remainder of their lives, and that Daniel should live with them, furnish and provide a home, with suitable food and clothing, while they lived, in consideration of which it was agreed, that at the death of Moses Ladd the entire interest in the land should become the property of Daniel. In pursuance of this agreement, the land was purchased by them jointly for $2,000, Daniel paying $1,200 of the purchase money, and his father contributing $800. They moved upon the land at once, and improved it to some extent. The mother died soon after coming to Kansas, but Moses Ladd resided with his son Daniel upon the land until the time of his death, in 1879. They lived together harmoniously, and the arrangement between them with respect to the disposition of the land seems to have been open and well known.

Under the testimony and the findings, it must be accepted as true that Daniel Ladd satisfactorily and substantially performed his part of the contract with his father, and that at the death of his father Daniel was entitled to the entire interest in the premises. It is true that, in one of the answers of the jury, they found that Daniel did not comply with all of the conditions of the agreement, but the court, upon ample testimony, found that there was a substantial compliance, and this is all that was required. Shortly before his death, Moses

Ladd conveyed his interest in the premises to Daniel, but it has been found that Moses was then insane, and did not understand the character and effect of the conveyance. The performance of the contract, however, gave Daniel Ladd an equitable title to the premises at the decease of his father, and, in view of the conclusion that was reached, that conveyance has become unimportant. Moses died leaving three heirs, Daniel, Harrison, and Lilla, who had married George Taylor. Lilla and Harrison, with knowledge of the agreement between their father and Daniel, compromised and settled with Daniel, upon the faith of which money was paid and accepted, and, relying upon the settlement so made, valuable and extensive improvements have been made on the land, with the plaintiff's knowledge and acquiescence.

Soon after her father's death, the plaintiff demanded a settlement with Daniel for her share of her deceased father's estate. There was a dispute and controversy in regard to the respective rights of each of the heirs. Daniel insisted that, by virtue of the agreement made with his father, the real estate belonged to him; that the personal estate of the father amounted to $625; that he held his father's notes for over $1,000; and that the plaintiff, Lilla, owed the estate about $135. After considerable controversy, it was agreed that the plaintiff should have certain household goods; that Daniel should assist her husband in building a house, and pay to her $300 in money. It does not appear that there was any concealment, surprise, misplaced confidence or fraud in the making of the agreement. The settlement and compromise were made in the presence of her husband, and the fact that the land was claimed by Daniel, and that there had been a deed executed conveying the same to him, was well known by all. Under the compromise, she received considerable more than her share of the personal estate, and more than she would have been entitled to under a regular administration. The settlement and compromise appear to have been deliberately made, as the parties, after arriving at an agreement, went some distance to the office of a justice of the peace, and there in the presence

of witnesses repeated their agreements and reduced them to writing. The plaintiff and her husband both signed a receipt acknowledging the receipt from Daniel Ladd of $300, "being our share of our deceased father's property, both real and personal." The real estate was not described in the writing, but it was the only real estate in which her father had any interest, and hence there was no chance for doubt as to what land was within the minds of the parties when the agreement and release were made.

After the compromise, Daniel proceeded upon the theory that all claims to the land by the other heirs had been relinquished, and that the settlement made was effectual and final. He then built thereon a residence; erected barns, stables, a granary, sheds, corrals, and other buildings of a substantial and valuable character; orchards and hedges were planted, and fences built — which altogether cost about $5,000. The plaintiff resided in the neighborhood, saw the improvements as they were made, without the suggestion of an objection or protest. Indeed, she treated the compromise and settlement as final, and acquiesced in the claim of complete title in Daniel for a period of 10 years. During all this time she encouraged Daniel to understand and believe that the dispute about the title had ended, and that she had abandoned any claim to the land. Under these circumstances, it would be unjust and inequitable to permit her to assert any right or title in the land. The settlement was made upon sufficient consideration, and, from the testimony and findings, we must assume that no undue advantage was taken nor fraud practiced upon her by Daniel. There was some claim that she was unaware of the fact that real estate was mentioned in the writing which she signed; but the real estate in controversy was the principal contention between the parties, and there is testimony to show that the writing was read in her presence several times before it was signed. Her claim upon the estate was a proper subject of compromise. She deliberately compromised and settled her claim, and the differences that existed between her and Daniel; and now, after enjoying the fruits of the settlement

for about 10 years and without offering to return them, she comes into a court of equity asking that her agreement and release solemnly entered into be overturned.   To grant her prayer would operate as a great injustice, and we think the court rightfully held that she was estopped from reopening the settlement or asserting any interest or right in the land.   It was well said by Mr. Justice VALENTINE, in *Yeamans v. James*, 29 Kas. 383, that—

*Compromise—validity—impeachment—equitable estoppel.*

"Courts of equity seldom encourage speculation in stale and doubtful claims; they seldom encourage the overturning of settlements voluntarily made and long acquiesced in; and they seldom encourage the disturbance of titles, long·vested, long enjoyed, and where all the parties for many years have acted as though they considered all questions with reference to titles as equitably settled and permanently at rest;   .   .   . Peace and repose are generally better in such cases than disturbance and turmoil."

Her declarations and acts, which have been relied and acted upon by defendant in error, together with the lapse of time without any claim upon her part, constitute an equitable estoppel and justify the judgment that was rendered. (*Faxon Faxon*, 28 Mich. 159; *Brands v. De Witt*, 44 N. J. Eq. 545; *Railroad Co. v. Railroad Co.*, 84 Ala. 570; *Chambers v. Chambers*, 6 S. Rep. 659; *Gormly's Appeal*, 18 Atl. Rep. 727; *Taft v. Taft*, 41 N. W. Rep. 481; Herman, Est., § 800.)

What has been said disposes of the claims of Agnes M. and Vinnie G. Ladd, who were the heirs of Harrison Ladd.   It is doubtful whether any issues were joined between them and the defendant Daniel.   Their pleading was filed after the answer of Daniel Ladd, and, while they admitted the allegations of the plaintiff's petition, and joined in her prayer for relief, they denied none of the allegations of the answer of Daniel. Assuming, however, that issues were formed, the facts in the case show that, at the death of Moses, Daniel had complete

38—53 KAS.

equitable title to the land, and hence their prayer for partition was properly denied.

The judgment of the district court will be affirmed.

All the Justices concurring.