KESSLER et al. v. ENSLEY CO. et al.

(Circuit Court, N. D. Alabama, S. D. May 15, 1903.)

No. 130.

1. CORPORATIONS—STOCKHOLDERS' SUITS—GROUNDS FOR RELIEF.

To entitle a stockholder to relief in a court of equity against a corporate act which is within the charter powers of the corporation, he must show either fraud or adverse interest on the part of the governing body, or equivalent facts which render such body incompetent to act in the interest of the corporation, as distinguished from mistakes or errors of judgment; and even then, if the case will admit of delay, he must have appealed from the decision of the directors to the body of the stockholders, and the facts must plainly put them in the wrong in refusing to take action.

2. SAME—TRANSACTION IN FRAUD OF CORPORATION—RATIFICATION.

All of the property of a land company which owned a town site and surrounding lands was sold under two judgments against it for a price of about $16,000, but leaving the company the right to redeem within two years. The company owed in all about $120,000, and by a subsequent arrangement, assented to by its stockholders, the property, together with the right of redemption, was vested in trustees with power to make sales, to pay all debts, and to hold or pay over the surplus, if any, to the company. Four years afterward certain stockholders applied to two successive boards of directors, and also to a meeting of the stockholders, asking that proceedings be instituted to set aside the conveyances and to recover the property. Such action having been refused

by the directors and also by the stockholders by a very large majority vote, minority stockholders brought suit for such relief in behalf of the corporation, alleging that the sale under the judgments was brought about through the fraud of a majority of the directors, who controlled the judgments, and who formed another company which purchased certain of the lands from the trustees; that by concealing such facts they obtained the approval of all such transactions by the stockholders. It further appeared from the bill that at the time complainants requested the corporation to bring the suit such directors were out of office, and did not own or control a majority of the stock, and it was not charged that they then exercised any influence over the other stockholders. *Held*, that it did not appear from the allegations of the bill that the original transaction was detrimental to the interests of the company, nor that it had operated to its detriment, but that, conceding it to have been fraudulent on the part of the directors, and that a court of equity would have set it aside at suit of the corporation, the subsequent action of the directors and stockholders in refusing to bring suit for that purpose, with full knowledge of the facts, was an election not to disturb the transaction which was binding on the corporation and the minority stockholders, no fraud or undue influence inducing such action being charged.

3. SAME—EFFECT OF ESTOPPEL OF CORPORATION.

A suit by minority stockholders in behalf of the corporation, to enforce alleged rights which inure to its benefit and that of all of its stockholders collectively, cannot be maintained where the corporation itself is estopped to maintain it, or honestly and fairly refused to authorize suit.

4. SAME—IRREGULAR ACTION BY CORPORATION—RATIFICATION.

Acts which a corporation had power to do, but which were done in an irregular manner or by the stockholders, where they should have been by the directors, may be cured and made valid by acquiescence or ratification.

5. EQUITY—LACHES—EFFECT OF STATUTE OF LIMITATIONS.

The fact that a state statute of limitations allows 10 years for the bringing of an action for the recovery of land does not preclude a federal court of equity from denying relief because of laches in a suit to set aside a conveyance, and recover the land on the ground of fraud, which is cognizable only in equity, although the suit was commenced within the 10 years.

6. SAME—ALLEGATIONS IN EXCUSE OF DELAY—SUFFICIENCY.

A delay of four years by stockholders of a corporation before taking steps to set aside conveyances by the corporation alleged to have been procured by the fraud of the grantees is not excused by a general allegation in the bill that complainants had no knowledge of the fraud until within three months prior to the suit, without any showing that inquiry was made before and where the means of knowledge was accessible.

7. SAME—DISMISSAL OF BILL.

Where it is held on demurrer that complainants are not entitled to relief on the equitable cause of action alleged in their bill, the cause will not be retained to administer relief which is purely incidental and properly of legal cognizance.

In Equity. On demurrer to bill.

Complainants, Alfred Kessler and Gustave Kissel, surviving members of the firm of Kessler & Co., and executors of William Kessler, deceased, and Charles K. Beekman, executor of William K. Beekman, deceased, who are citizens of New York, who were stockholders of the Ensley Land Company at the time of the grievances complained of, and are still such stockholders, filed their bill against the Ensley Land Company, the Ensley Company, G. B. McCormack, Erskine Ramsay, James Bowron, and Nelson E. Barker, who are citizens of Alabama, and Nathaniel Baxter, Jr., and A. M. Shook, who are citizens of Tennessee. The opinion gives the facts concerning the formation of the Ensley Land Company, its property, and history and vicissitudes of the corporate enterprise, and many other facts necessary to a proper understand-

ing of the case made by the bill, so that it is necessary here only to state the substance of the allegations of the bill, which is quite lengthy. It charges, in substance, that McCormack, Bowron, Baxter, Shook and Ramsay, who at the time of the commission of the grievances complained of constituted the majority of the directors and chief officers both of the Land Company and of the Tennessee Coal, Iron & Railroad Company, which all the while owned a majority of the stock of the Ensley Land Company, formed and executed a plot to obtain the most valuable part of the property of the Ensley Land Company, at Ensley, for their own benefit, and thereby made a large profit at the expense of the Land Company. It is charged that to effect this plot they obtained control of a judgment against the Ensley Land Company, which then owed debts amounting to about $120,000, some of which were in judgment. Upon this judgment, which was rendered in 1893, but had not theretofore been attempted to be enforced, they had execution to issue in December, 1896, and caused all the property of the Land Company to be sold by the sheriff, and a conveyance to be made to Mary T. Warner, executrix, at a time when none of the other creditors of the company were pressing it, and when the Tennessee Company, if it had been advised, would have furnished the money to pay the judgment, and thus averted the sale. On the 23d of December, 1897, defendants, who had purchased all the right, title, and interest acquired by Mary T. Warner, had the property conveyed to the Ensley Company, a corporation really, though not nominally, formed by the defendants, and of which they owned all the stock, to enable them the better to carry out their scheme. The Ensley Company was incorporated on the 21st of December, 1897. On the 28th day of December, 1897, the Ensley Company conveyed all the lands to defendants Barker and Bowron, reciting in the conveyance that they had purchased the lands, which recital was false. It is alleged that the money consideration mentioned in this deed was raised on the credit of the Tennessee Company, and that the defendants, at the time of the transaction, stated, to those who inquired, that the object was to enable the Ensley Land Company to redeem. It is charged, further, that this conveyance by the Ensley Company to Barker and Bowron was upon the "understanding and agreement between defendants McCormack, Shook, Baxter, Bowron, and Ramsay that, as soon as they could arrange to get away from the Ensley Land Company its statutory right of redemption and legal rights in the premises, said lands, or a large part of the choicest and most valuable, should be reconveyed to said Ensley Company." At a general meeting of the stockholders of the Land Company on January 25, 1898, Shook, as president, reported the sale under execution on the Warner judgment, and the condition of the affairs of the company, and that it was necessary for the company to relinquish its statutory right of redemption to trustees agreed upon by creditors, in order to hold onto the property, and clothe the trustees with the legal title, which would enable them to sell property from time to time, and thus pay off debts and save the residue of the property for the company. At this meeting the stockholders authorized the company to execute a conveyance to Barker and Bowron, releasing and conveying to them the statutory right of redemption to the property, and directed the board of directors to cause Barker and Bowron to execute such declaration of trust as in the judgment of the directors would protect the interest of the company, its creditors and stockholders, and that upon the execution of such declaration of trust, upon conditions satisfactory to the board, the president and secretary were authorized to execute such conveyance to Barker and Bowron. At the same meeting resolutions were passed recommending that the trustees "trade with the Ensley Company on the lines indicated in the proposal submitted by the Ensley Company at this meeting." This proposal, which is set out in the opinion, was an offer by the Ensley Company to purchase 220 acres of the company's property, on certain moneyed and other considerations stated in the proposal. It is alleged that the defendants, by reason of their confidential and official relations to the Tennessee Company, knew that it would soon erect a large steel plant at Ensley, which would greatly enhance the value of the Land Company's property, but this was unknown to the public or to the stockholders of the Land Company. The defendants concealed this fact, as well as the actual status of the title at the time, and how

it had been brought about, and also that they were interested in the Ensley Company, all of which facts it was their duty to disclose. It is alleged that if the directors had publicly announced the early erection of the steel plant, and then placed lots on the market for sale in the usual way, they could have easily procured money to pay off its debts, and that the defendants purposely concealed the information from the stockholders, that they might be the more readily induced to consent to the scheme complained of. It is also alleged that one of the defendants procured a proxy to vote the stock of the Tennessee Company, by misrepresentations to the trustee under a mortgage given by the Tennessee Company upon its property, and, by the use of this proxy, voted the Tennessee Company's stock in the Land Company, which was a majority, in his own interest, and thus effectuated their scheme at that meeting; that the trustee had no authority to give any proxy to vote this stock; that the Tennessee Company did not consent to it; and that the voting of the Tennessee Company's stock, under the circumstances, could not authorize the conveyance which the president and secretary of the Land Company made to Barker and Bowron, nor any of the other things which were directed to be done at that meeting. It is further charged that at the time of the transfer, by the purchase of the title acquired under the Warner judgment, to the Ensley Company, one of the defendants having really acquired the title, owing to his fiduciary relations to the Land Company, he held the title in trust of the Land Company, and that the conveyance should have been made to the Land Company, and not to the Ensley Company, and that the defendant and the Ensley Company, in equity, held the lands in trust for the Ensley Land Company; that on the 24th of February, 1898, Barker and Bowron conveyed 220 acres of the choicest and most valuable lands of the Land Company to the Ensley Company, "which has ever since continued to claim the absolute title thereto"; that subsequently the trustees, Barker and Bowron, conveyed to McCormack and Ramsay 20 more acres of valuable lands of the Land Company, including the most valuable part of the town site at Ensley, and that the property thus sold was worth over $200,000, and could have been sold at that time, by the use of ordinary prudence and care on the part of the defendants, for at least $100,-000, whereas it was all sold to the defendants for $16,600, and the promises of the Ensley Company to erect certain buildings and start certain enterprises, as set out in the opinion, most of which promises remain "utterly unfulfilled." The bill attacked these transactions, and the legality of the conveyances made to carry them out, not only on account of the fiduciary relations existing between the defendants and the Land Company, and the failure of the defendants to disclose their interest and the other facts recited, but also, inter alia, because the sheriff's sale in 1897 was of the entire property in bulk, instead of by lots and parcels, it having been laid off in town lots, and also on the ground that the stockholders of the Land Company had no authority to sell and convey its property, that power being vested in the directors, and that the stockholders had no authority to relinquish the statutory right of redemption, except by a vote at a meeting called for that purpose, after 30 days' notice. It was also objected that the published call for the meeting in 1898 designated Birmingham as the place of meeting, whereas, under the by-laws of the company, the meeting must be held at Ensley; and that the proxy under which was voted the Tennessee Coal, Iron & Railroad Company stock, which constituted the majority at the meeting in 1898, was illegal, and that the vote of its stock under that proxy was illegal, and did not authorize any of the transactions complained of. Earnest efforts were made by the complainants with the outgoing board of directors in 1901, and at a general meeting of the stockholders of the Land Company on January 25, 1902, and with the newly elected board of directors in the same month, to have the Land Company bring suit to redress the grievances in question, with the written application for this action, setting forth the conveyances sought to be annulled, and the grounds relied on. In each instance they were refused. The bill fully and clearly shows that the suit was not collusive to confer jurisdiction, and that the amount in dispute exceeds $2,000, interest and costs. The bill alleges "that all the acts and doings of the defendants, and the real truth pertaining to said conveyances, and the fraud and deceit

practiced by said defendants Baxter, Bowron, Shook, McCormack, and Ramsay, were unknown to the complainants until within the last three months, and that since becoming informed thereof complainants have been guilty of no delay in taking the proceedings set forth to obtain their rights." The date to the jurat to the bill is March 1, 1902, and the bill was filed April 25, 1902.

The relief prayed is, in substance, that the defendants be held to be trustees in invitum; that the conveyances of lands to them be canceled, and they be decreed to reconvey them to the Land Company, and in event any portion of the land has been conveyed to bona fide purchasers, so that it cannot be recovered in this suit, that decrees be rendered against the defendants, the Ensley Company, and McCormack and Ramsay, for all damages suffered by the Ensley Land Company and its stockholders by reason of the grievances set forth; and also that decrees be rendered against Bowron, Shook, and Baxter for all damages suffered, which cannot be recovered from the Ensley Company, McCormack, and Ramsay. There is also a prayer for an accounting of the rents, profits, and issues, complainants offering "to allow a credit to defendants for all sums lawfully expended for the Land Company, or which inured to its benefit"; and for general relief. The Ensley Land Company answered, neither admitting nor denying the material allegations of the bill, but calling for strict proof thereof. The other defendants demurred on the grounds, among others, that the bill showed on its face that complainants have been guilty of laches, and also that the Ensley Land Company, in whose right the bill was filed, had elected to ratify the transactions complained of.

T. M. Steger, J. W. Baker, Smith & Smith, and I. K. Boyesen, for complainants.

John B. Knox, Jas. C. Bradford, John F. Martin, E. J. Smyer, and William A. Walker, for defendants.

JONES, District Judge (after stating the facts as above). This case has been ably and elaborately argued. It is unnecessary, however, to decide all the interesting questions discussed. The right to maintain the bill depends upon a few controlling issues, which will now be considered.

Equity permits a stockholder to maintain a bill to enforce the rights of his corporation, solely to prevent a failure of justice. "The circumstances of each case determine the jurisdiction to give the relief sought." Dodge v. Woolsey, 18 How. 344, 15 L. Ed. 401. To entitle the stockholder to relief, it is not enough that the governing body has refused to act, or that the refusal evinces mistaken judgment. The stockholder who seeks redress as to any corporate act which the charter permits the corporation to perform must show either that the governing body is so disorganized that it cannot act; or that it is interested adversely to the corporation, or under the dominion of those who are; or will be required to disapprove its own breaches of trust, as distinguished from mistakes or errors of judgment; or that its refusal will endanger the rights and franchises of the corporation, or result in irreparable loss and injury; or that its attitude, under the situation presented by the bill, discloses negligence or indifference to the interest of the corporation, in such degree as amounts to the practical equivalent of bad faith; or else bring forward other pertinent facts which challenge and impeach the fitness of the governing body to properly decide the question at issue. Even then, if the case will admit of delay, the complaining stockholder must appeal from the decision of the directors to the

body of the stockholders at large, and the facts averred in the bill must plainly put them in the wrong, before the court will feel authorized to entertain the complaint of the stockholder. Hawes v. Oakland, 104 U. S. 450, 26 L. Ed. 827; Corbus v. Gold Mining Co., 187 U. S. 458, 23 Sup. Ct. 157, 47 L. Ed. ——; Tuscaloosa Manufacturing Company v. Cox, 68 Ala. 71.

It not being charged in this case that either of the two boards, or the body of the stockholders, who declined to bring or authorize the bringing of this suit, were themselves guilty participants in any of the frauds complained of, or in any wise interested adversely to the corporation, or under the dominion or control of those who were instrumental in bringing about the sales sought to be avoided, or that they acted otherwise than in the exercise of honest judgment as to the interest of the Land Company, their decision not to litigate is binding upon the court, unless that refusal will result in enforcing some ultra vires or illegal act of the corporation, or evinces such recklessness and indifference to the rights of the corporation as amounts to bad faith or fraud, or will needlessly work the practical destruction of the corporate enterprise. To properly determine these questions the court must look to the status and condition of affairs as they reasonably appeared to the stockholders, under the facts set forth in the bill, at the time of entering into the transactions now sought to be set aside, and then weigh their decision not to disturb them in the light of existing conditions at the time that decision was made.

The Land Company, in January, 1898, when these transactions were entered into, had been incorporated for more than 10 years. Its assets consisted of "more than thirty-seven hundred acres of valuable lands" in and about Ensley, at which place the company sought to found a town. The lands originally belonged to the Tennessee Coal, Iron & Railroad Company, which conveyed the property to the Ensley Land Company for $10,000,000, at which sum its stock was capitalized. Capital stock was issued to that amount to the Tennessee Company, which all the while retained the majority of the stock, though it sold much of it to third persons. The capital stock was afterwards scaled to $500,000, without withdrawing any of the assets. The Land Company had improved a portion of its lands for the purpose of inviting settlement, and laid off what was considered the best parts into lots and streets. Steam and street railroads ran through Ensley, and gave it almost hourly communication with Birmingham. A hotel and other buildings had been erected and improvements made, upon which upwards of $60,000 had been expended, and the company owed "about one hundred and twenty thousand dollars" in 1893. There was then, and for that matter still is, no claim that these expenditures and debts were not fairly made and incurred in the interest of the corporation. The company had not been able to attract any industries, or to make any considerable progress in securing purchasers of its property. As far back as 1893 it had not been able to meet its liabilities, and a number of its debts had been put in judgment. The financial stringency of 1893 and its consequences, to which the bill alludes, came on. In 1894, while the ef-

fects of this "panic" were yet acute, the whole region around Ensley had been the scene of deplorable lawlessness and disturbed labor conditions, necessitating the stationing of a regiment of state troops at Ensley for a considerable time, to protect life and property there and in the vicinity. Executive Documents of Alabama, 1894–95. Of these things a court sitting in this locality may well take judicial notice. Ashley's Adm'x v. Martin, 50 Ala. 537. As said in Taylor v. Barclay, 2 Sim. 213, "whenever such facts throw light upon the transactions, they are as proper to be considered on demurrer as if set out in the bill itself." Industry, trade, and enterprise of every kind were paralyzed for the time. There was slight, though gradual, improvement in the two succeeding years. The company, however, remained without income, or means of disposing of its property at anything like its value. All its property had been sold under execution early in 1897. The statutory right of redemption would expire on the 25th of January, 1899. The past conditions and history of the property necessarily challenged the attention of stockholders, whenever they considered what was best to be done for the future. Whether the stockholders were informed at any time prior to the meeting in January, 1898, of the sale of all the property under execution, or of the plan of the directorate, by means of the trust deed to Bowron and Barker, to satisfy creditors and induce them to wait until the property could be handled to advantage, does not appear. However that may be, the facts were reported to the stockholders on January 25, 1898, in the following communication from President A. M. Shook:

"To the Stockholders of the Ensley Land Company: Since your last annual meeting, all the property of the Ensley Land Company has been sold by its creditors. On the 25th day of January, 1897, the realty was sold by the sheriff, and bought in by the executrix of the estate of James C. Warner, deceased, who was the owner of what is known as the Birmingham Railway & Electric Company judgment, for fifteen thousand, one hundred, sixty-eight and 91/100 dollars. About the 18th of September last, the personal property was sold for five hundred and twenty-five dollars, under an execution obtained by Napoleon Hill, of Memphis, Tennessee, for thirteen thousand, three hundred forty-eight and 96/100 dollars. The result of these sales left the Ensley Land Company nothing except the statutory right of redemption. The aggregate amount of indebtedness due is about one hundred and thirty thousand dollars. For the purpose of liquidating these debts, the creditors have agreed upon a plan of having the property conveyed to two trustees, Messrs. N. E. Barker and James Bowron, with the understanding that when a sufficient amount of property has been sold to pay off the debts of the Ensley Land Company, and the expenses incident to the execution of the trust, that all the remaining property shall be conveyed to the Ensley Land Company. For the purpose of enabling the trustees to make absolute title to the property they may sell, it is necessary that the Ensley Land Company shall waive its statutory right of redemption. I suggest that our attorneys be requested to draw up such papers as will make effective the will of the directors in this respect, and that the directors be authorized to consummate an agreement with the trustees appointed by the creditors."

This report was spread upon the minutes. At the same meeting, by a vote of 2,597 shares in the affirmative to 30 in the negative, a resolution, moved by defendant McCormack and seconded by defendant Shook, reciting the sale of the real estate under the Warner judgment, and that Barker and Bowron were now the owners of said

real estate, and that the same was subject to the statutory right of redemption in the company; that the company owed other debts besides the debt for the payment of which the real estate was sold, and that said real estate, being offered for sale in the ordinary manner, is more than sufficient to pay all the debts of the company—was adopted, as follows:

"Therefore, resolved, upon the execution by said Barker and Bowron of a declaration of trust, in and by which they shall declare that they hold and own said real estate in trust for the benefit of the creditors of the company, the terms and conditions of which declaration of trust and the priority of the claims of creditors secured thereby, shall be satisfactory to the board of directors of the company, the company will make and execute a conveyance to said Barker and Bowron, releasing and conveying the statutory right of redemption of the company in and to all the said real estate. Resolved further, that the board are authorized and required to cause and procure the said Barker and Bowron to make and execute such declaration of trust as shall, in their judgment, protect the interest of the company, its creditors and stockholders. Resolved further, upon the execution of such declaration of trust, the terms and conditions of which shall be satisfactory to said board of directors, the president and secretary of the company, be and are authorized and required to execute such conveyance to said N. E. Barker and James Bowron."

At the same meeting a resolution was adopted recommending "the trustees to donate free sites for manufacturing enterprises proposing to locate at Ensley." The minutes further show the following proposition from the Ensley Company was submitted for the action of the stockholders: "We will give you fourteen thousand and six hundred dollars for two hundred and twenty acres of land described as follows"—naming certain lands. "We will guarantee the building of twenty houses on this land in six months, forty houses in twelve months, and fifty houses in two years. You can name a price on each lot and block you are willing to put on the market, and give us the exclusive right to sell the same, paying us ten per cent. commission on all such sales. When lots are sold on time, we to pay the fixed price ourselves." The proposition also "guaranteed" to sell ——— number of lots within a certain time; also "to cause to be erected in one year at Ensley a foundry and machine shop sufficient to do all work obtainable, and enlarge it as the business required; to put in operation a red brick making plant with capacity to furnish brick for local demand; to erect and operate a planing mill sufficient for the needs of the town; to locate a drug store at Ensley, and a lumber yard and supply store. The proper material being made at Ensley and furnished us at competitive prices, we will cause to be erected a plant for the manufacture of bolts and nuts for rivets, steel plow shapes, boilers, and bridges. Suitable material being found, to erect a plant for the manufacture of lime. If found practicable, and molten steel is sold us at reasonable prices, we will cause to be built a plant for the manufacture of steel castings. For the location of industries, free sites will be donated by you. It is understood in the location of manufacturing enterprises we are to have the support and approval of the trustees, and the Tennessee Company would be expected to give industries at Ensley as low net rates on raw material as given any one located elsewhere." As the

minutes state: "After reading the foregoing, it was resolved that it be recommended to the trustees that they trade with the Ensley Company on the lines indicated in the proposal, which is submitted by the Ensley Company at this meeting." Twenty-five hundred and ninety-seven shares voted in the affirmative and 30 shares in the negative. Shook was the mover of this resolution. At this meeting a board of directors was elected, of which the defendants Baxter and Shook were members. Shook was elected president. A resolution was adopted that a committee consisting of W. A. Walker and A. M. Shook be appointed a committee to treat with the trustees, Barker and Bowron, and receive the declaration of trust as provided by the resolution of the stockholders, and report the same back to a meeting of the board of directors.

The facts heretofore outlined show the situation as it presented itself to the minds of the stockholders in January, 1898. The apparent situation was the real situation, except that the stockholders did not know that the defendants had any concern in the purchases, and were not advised that there would be an early erection of "the large steel plant" of the Tennessee Company at Ensley; or as charged in the bill, upon "information and belief," that the sale under the Warner judgment the year before had been needlessly brought about by the machinations of the defendants who controlled the judgment, when the Tennessee Company would have come to the rescue if it had been applied to; or that the Tennessee Company's stock would not have voted for the transactions complained of if the defendants, who were also its officers, had truly advised it as to the facts; or that the title had already been vested in Barker and Bowron by the machinations of the defendants, as alleged in the bill. The Tennessee Company could hardly have long been ignorant of the sale under the Warner judgment. Payment of that judgment would not have satisfied the other creditors. Redemption from the sale under it, in the name of the Land Company, would have invited other sales, unless the Tennessee Company provided for the claims of other creditors, whose debts, some of which were in judgment, amounted to over $100,000. That sale finally resulted in a declaration of trust in the lands for creditors, and, after paying debts, to return the remainder to the Land Company. If the Tennessee Company had taken up the debts, it would probably have required something of the sort. The fact that it was a majority stockholder did not put it under legal or moral duty to bear all the burdens of the corporation. The effect of the sale, save as it formed part of the device which enabled the defendants to accomplish their purpose, as charged, was not harmful to the Land Company. Under the conditions disclosed by the bill, the law imposed upon the property in the hands of the company the very trust upon which Barker and Bowron declared they held it. The reliability of the "information and belief" that the Tennessee Company would have come to the rescue of the Land Company in 1898, and would not have permitted the majority stock to be voted for the transactions then entered into, if the stockholders had been fairly informed, is somewhat weakened, if not overthrown, by the significant fact that four years afterwards the vote

of the Tennessee Company, which then had full knowledge, controlled the action of the stockholders, as well as of the two boards of directors, of the Ensley Land Company, who positively refused to disturb the transactions. Whatever the facts, these things, of which the bill avers the majority were then ignorant, cannot have any weight in determining the bona fides of the stockholders' action in the year 1898. The bill does not state, and therefore we can only conjecture, the amount of capital required to be expended by the Ensley Company in inaugurating the various industries agreed to be started as part of the consideration for the lands proposed to be purchased. The amount realized from the sale authorized by the stockholders to the Ensley Company, and the sale of the two other tracts which the trustees conveyed about this time, was a greater moneyed consideration than the whole 3,700 acres of land had brought under the execution sale the year before. There was also the further consideration of building houses, the erection of manufacturing plants, and the starting of business enterprises, which in all probability would result in speedy and great benefits to the remainder of the Land Company's property. In the then condition of affairs, no matter how brought about, some arrangement with the creditors was inevitable. By accepting the arrangement proposed, the creditors could be induced to wait, and an opportunity would be afforded to dispose of the remainder of the property to advantage, instead of having it all sold at a sacrifice. Under the circumstances, the stockholders, with the lights then before them, might well have considered the acceptance of the plan outlined in the president's report, involving the sale to the Ensley Company, as a wise and advantageous solution of the corporate difficulties.

What was the situation in 1902, when the stockholders were asked to bring this suit? Four years had then elapsed, and no complaint or objection had been interposed from any source against the transactions entered into in 1898, and for the first time sought to be avoided in 1902. The bill is silent as to the effect of the plan, in the meantime, in paying off the debts of the Land Company, or as to the disposition of the remaining 3,460 acres of "very valuable land," which had not been sold to the Ensley Company and McCormack and associates. The just inference from the allegations of the bill in other respects, and its peculiar silence in the particulars named, is either that these creditors of the Land Company had then all been paid off, and the lands of the company, with the exception of the 240 acres and such portions as the trustees might have sold to pay debts, had been reconveyed to the Land Company, or else that whatever remained of the property was held by Barker and Bowron, who were still executing the trust. It would be a most unjustifiable presumption, in view of the recitals in the bill, that the cash received from the sales complained of had not been used in the payment of the debts of the Land Company. At all events, the creditors had remained quiet. This they would not have done if the plan had not been a success, so far as they were concerned. If it had resulted badly in other respects, so that practically nothing was left for the Ensley Land Company, the just presumption is that complainants

would have so stated in their bill. The bill is singularly silent as to these matters. It is far from showing that the execution of the plan brought about the practical destruction of the corporate enterprise. The stockholders' meeting in 1902 knew that the creditors of their company no longer pressed it, and, necessarily, what had induced them to forbear, and what had become of the property of the Land Company. They were dealing then with corporate conditions which were the mere sequel of the transactions spread upon their minutes in 1898, which disclosed the corporate action as to the proposal of the Ensley Company, and the creation of the trust powers, and the title lodged in Barker and Bowron. The stockholders then knew that their company had allowed these purchasers, the Ensley Company and McCormack and Ramsay, to remain in open, adverse possession, dealing with these 240 acres as their own, for four years, without dissent of any kind from the Land Company, which all the while retained the benefit of the consideration. The date of the erection of "the large steel plant" is not shown by the bill. The just inference from its statements is that the enterprise was publicly announced and work commenced shortly after the stockholders' meeting in 1898. Necessarily, the stockholders' meeting in 1902, among which stockholders was the Tennessee Company, which built and owned the steel plant, then knew when the steel plant was erected. The majority stockholder, the Tennessee Company, certainly knew in 1902 whether, at the time of the meeting in 1898, it had in view to commence the building of the steel plant, and whether the plans relating to it had so far progressed as to make its erection a matter of reasonable certainty before or shortly after the time of the meeting in 1898. The stockholders' meeting in 1902 knew of the conveyance by which the Land Company's property had been conveyed, first, to Warner's executrix, and afterwards to Barker and Bowron, and of the conveyances in which the Ensley Company was concerned, and of its organization, the purpose for which it was organized, and the declaration of trust made by Barker and Bowron, and the deed to McCormack and Ramsay. They knew, of course, which of the defendants were directors or officers of the company when the sale was made, and when the others retired from its service. The stockholders' meeting in 1902 may have believed that the obligations undertaken by the Ensley Company, although, as stated in the bill, "most of said conditions remain utterly unfulfilled," could be performed, and would be carried out, or could be enforced, whereby the lands remaining in the possession of the Land Company would be greatly increased in value. It is not shown by the bill which of these conditions remained unfulfilled or which had been performed, or that their non-performance was due to the fault of the defendants. The performance of some of them was conditional—as, for instance, "if found practicable, and molten steel is sold us at reasonable prices." The Land Company was to "furnish free sites for industries." It knew whether it had done so. It knew whether "suitable material could be found at Ensley for the manufacture of lime." It knew whether the defendants had "the support and approval of the trustees," and whether the Tennessee Company gave industries at Ensley "as low net prices

on raw material as given any one located elsewhere." In the absence of any averment as to which of these conditions had been performed, and which had not been performed, or their value, or whose fault it was that they were not performed, it is not safe for the court to substitute its judgment, as to this matter, for that of the stockholders, in determining what weight the value of the obligations of the purchasers in the respects named should have had in determining the adequacy of the price, and whether the sale should be set aside. In the absence of causes shown that would influence them otherwise, the presumption is that the directors would do their duty. The presumption is the majority of the stockholders, "in the absence of causes to influence them otherwise, would act as their pecuniary interest required." Decatur Mineral Land Company v. Palm, 113 Ala. 531, 21 South. 315, 59 Am. St. Rep. 140.

The stockholders themselves knew in 1902 of the defects in the call for the first meeting in January, 1898, which adjourned to another day, and that it was held in Birmingham, and not at Ensley, as required by the by-laws. The Tennessee Company, which all the while owned the majority of the stock of the Ensley Land Company, certainly knew in 1902 whether its stock had been voted on a wrongful proxy, or against its wishes and interests, regarding the matters complained of, which transpired four years before. At the meeting in 1902 the defendants were no longer officers or directors of the Tennessee Company or of the Land Company. It is stated in the bill that McCormack and Bowron retired in January, 1898, and that the other defendants remained "such officers and directors, and members of the governing committee, until within the last few months." The "few months" are those elapsing in the interval between the date of the jurat to the bill, in March, 1902, and the refusal of the stockholders to bring this suit, January 23, 1902, and the like refusal of its board of directors shortly before and shortly after the stockholders' meeting. It must be inferred, therefore, that the defendants retired as officers or directors of both companies before the Land Company's meeting at which the Tennessee Company's stock was voted against the authorization of the suit. Moreover, it is not charged that the defendants at that time either exercised or attempted to exercise or had any control or influence over the stockholders of either company. Under the circumstances reviewed, the stockholders of the Land Company, who voted, in the proportion of over 80 to 1, not to authorize the suit to redress a grievance happening over four years before, may well have thought, on the whole, that it would not be advantageous, or that their company had acquiesced too long, and that its silence and knowing retention of the benefits of the transaction would defeat the suit if brought, and entail useless cost and expense upon the corporation. In view of all these considerations, their decision is not open, in the absence of any charge of improper motive on the part of the majority, to reasonable condemnation, as evincing such negligence or criminal indifference to the interest of the corporation as amounts to bad faith, fraud, or oppression of the minority.

Making due allowance for the charges on "information and belief," and for facts so stated as to amount to no more than the opinion of the pleader, the bill charges actual fraud of a grave nature, not merely constructive fraud, upon all the defendants except Barker. On the facts stated, a court of equity would unquestionably have set aside the sale on seasonable application. Nevertheless, under decisions which are controlling here, the transactions complained of were not void as to the corporation, but merely voidable. Twinlick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328; Thomas v. Brownville R. R. Co., 109 U. S. 524, 3 Sup. Ct. 315, 27 L. Ed. 1018. The title conveyed by the proceedings complained of was not bad until the Land Company made it good, but remained good until it was made bad. It was a defeasible title which would ripen into a good title if not seasonably avoided. The conveyances were not ultra vires the corporation. The Land Company was formed for the purpose of selling this very land, and the sales were made in the exercise of the corporate power of providing for the debts of the company. The power must reside somewhere in every corporation, when it has been defrauded, whether by its own officers or third persons, to determine what course it will pursue with reference to the fraud. The fact that the corporation has been defrauded does not strip it of power to elect to stand upon the transaction as made. Every wronged person, who is sui juris, has that right against the wrongdoer. If the corporate tribunal exercises its judgment upon the question honestly, and is not adversely interested, or under the control of other influences which sway it from a fair and impartial judgment, from the standpoint of the interest of the corporation itself, a decision not to disturb the fraud, unless it evinces such recklessness and negligence as amounts to bad faith, is not a fraud upon the objecting stockholders, though it results in a refusal to redress a fraud upon the corporation. The duty which the corporation, or its governing body, owes its stockholders in such cases, is to fairly and impartially consider the question of redressing the wrong, and not to commit a corporate fraud upon its stockholders by refusing to set aside the fraud upon the corporation from selfish interest or other bad motives, or from such negligence and indifference as is equivalent to bad faith, and amounts to a clear breach of trust, as distinguished from mere bad judgment.

Complainants cite Mason v. Harris, L. R. 11 Chan. Div. 97, in support of their contention that the grievances complained of were either incapable of ratification, or that the refusal to redress them, under the circumstances here disclosed, amounts to a fraud upon the minority. They quote the following paragraph from the opinion in that case:

"Whenever a fraud is committed by persons who command the majority vote, the minority can sue. The reason is plain, as, unless such suit were allowed, it would put it in the power of the majority to defraud the minority with impunity. If the majority were to make a fraudulent sale and put the money in their own pockets, would it be reasonable to say that the majority could affirm the sale?"

The court was there speaking of the injustice of compelling a stockholder to abide the judgment of those who were interested in

upholding the fraud. It was referring to the fitness of the governing body at the time the individual stockholder seeks redress. Although the defendants here had "command of the majority vote" at the time of the grievance complained of, by reason of the deceit charged in the bill, whereby the majority was overreached and deceived, just as the complaining stockholders charge they were, the fact that the majority had been thus deceived into voting for the proposition does not disqualify it from passing on the matter when discovery is made. It is not to be driven from the judgment seat merely because it has been the victim of fraud. It must be shown to have some adverse interest, or to be under ulterior influences which prevent it from fairly determining what is to the best interest of the corporation, under all the circumstances, in view of the nature and result of the fraud practiced upon it. To bring this case within the rule of Mason's Case, supra, the defendants must "command the majority vote" at the time redress is sought. Other cases cited in behalf of complainants on this point relate either to ultra vires or illegal acts of the corporation, as where the governing body to which application for redress must be made has itself either defrauded the corporation, or is under the control of those who overreached it, or is otherwise shown to be an unfit tribunal to determine the policy of the corporation; or, where the act complained of not only affects the rights of the corporation against the person sought to be sued, but also involves some wrong by the corporation to separate and individual rights of the stockholders against their corporation. The principle which forbids the majority of the corporation to profit at the expense of the minority, by condoning a fraud against their corporation, is wholesome, and not in any wise questioned. We have no such case here. The great body of the stockholders who agreed to the transactions complained of in the first instance, and afterwards refused to set them aside, are shown to have been ignorant of the fraud at the time it was committed, and are not shown then, or at any subsequent period, to have been influenced by any interest adverse to the corporation, or by any motive which unfits them to pass upon the matter. Their vote refusing to disturb the transaction could not put any fruits of the wrong in their pockets. They gained nothing which the minority lost. They applied the identical measure of justice to themselves and the dissenting stockholders. As they constituted almost the entire body of stockholders, almost the entire burden of any loss entailed by their decision would fall upon them. On the face of the bill, there was unselfish determination.

The recovery sought by this bill is for the benefit of the corporation. The bill is filed solely in right of the corporation, and does not seek to enforce any separate or individual right of the stockholders. The corporation is only a nominal defendant. It is the real plaintiff. It is clear upon principle, in such a case, that the stockholders cannot maintain the suit, if the corporation itself is not in position to do so. It is an elementary principle of law that one claiming through and in subordination to a party estopped is himself estopped. The cases which permit a recovery in behalf of the corporation, in avoidance of transactions which it is estopped to rescind,.

because it has consummated them and retained the benefit, are those in which the corporation has entered into some ultra vires or illegal transaction, done something involving infraction of some direct right of the shareholder against the corporation—as where, without the authority of law, it subordinates the exercise of its corporate powers and control of its property to the dominion of a rival, or embarks in enterprises not authorized by the charter, or takes some action impairing the rights of the stockholders as among themselves, as by unlawfully issuing preferred stock, and the like. In such cases the illegal transaction is a distinct wrong of the corporation, against the rights of the stockholders separately and individually. It gives each stockholder a right to restrain its action and to compel it to retrace its steps. In such cases, justice can generally be done only by returning the corporation to its original status, and restoring the stockholder's rightful legal status towards it, by ripping up the whole transaction, although the corporation itself, as such, may be estopped to complain. The stockholders in this case are seeking to enforce no such right. They demand the enforcement of a right which belongs to the corporation solely, as such. The sales complained of are not ultra vires the corporation, and were not forbidden by statute. The grievances relate to transactions wholly intra vires. The corporation has deliberately refused to disturb them. This solemn corporate decision puts an end to any right of the dissenting stockholder to disaffirm or to compel the corporation to avoid the transaction.

An analysis of the premises of the argument in support of the contrary conclusion shows that it is unsound. The transactions here complained of not being void, but merely voidable, who can avoid them? Certainly, only the parties to the transaction, no rights of creditors being involved. There are only two parties—the corporation and the fraudulent grantees. The latter cannot set up their own misconduct to avoid the transaction. The former can act only by its governing body or by the stockholders collectively. There is but one subject-matter, and that is the sale and purchase of the land. The transactions must either be good as to the Land Company or bad as to the Land Company. They must either be avoided in toto or must stand in toto. If one stockholder, acting for himself, can affirm, another, acting for himself, can disaffirm. There is but one thing to affirm, and it must either be binding upon all the stockholders or not binding on any of them. The power to affirm or to disaffirm in a case of this kind is not an individual prerogative, but the right and power of the whole body of stockholders collectively. This collective body must act and decide according to the vote of the majority. "The rule is that the majority governs, and every stockholder contracts that such shall be the rule." Morawetz on Corporations, § 474. When, therefore, the majority, in such a case as this, refuses to disaffirm, all right of the majority to disaffirm is gone. There can be but one disaffirmance, and that must be the disaffirmance of the governing body of the corporation. A majority of the stockholders, in a case of this kind, represent the ultimate corporate sovereignty, within the limits of its charter, and can bind the minority by its

refusal to disaffirm as to a matter intra vires. The only remedy of the minority is to appeal to a court of equity to enforce the rights of the corporation, if the majority has acted fraudulently, or in bad faith to the minority, in refusing to redress a fraud upon the corporation. Foss v. Harbottle, 2 Hare, 461; Urner v. Sollenberger, 89 Md. 316, 43 Atl. 810. That charge is not made here.

Take it, however, that the rights of the complainants depend upon their own conduct; the result, upon well-settled principles, must be the same. Everything complained of is intra vires. The wrongs involved are private, not public, wrongs, and they may be condoned and ratified. It is unnecessary to decide whether, under subdivision 7 of section 1256 of the Code of Alabama, the stockholders had any authority to relinquish the statutory right of redemption, except by vote at a meeting specially called, after 30 days' notice, etc. The object of the statute was to prevent the incumbering or selling of property to which the company had title, or at least right of possession, and not to put obstacles in the way of redemption contracts which affect a mere statutory right in property, the title and possession of which has already passed out of the corporation, and which but for the arrangement would be finally lost to it. There might arise an emergency preventing the giving of 30 days' notice. Nor is it necessary to decide whether the stockholders, in view of the broad powers of the directors as to the management of the property and control of the business of the corporation, were without authority to order a conveyance of its lands, under the conditions in which the Land Company found itself. It cannot be denied that the corporation, acting through the proper instrumentality and in the proper mode, could have done both the things complained of. The complaint is not that the corporation could not do these things, but that they were done by the wrong body in the wrong way. Such acts may be cured by acquiescence or ratification.

Complainants insist that their delay of over four years, under the circumstances disclosed by the bill, cannot bar them of relief, because this is a suit in equity for the recovery of land; that the limitation to such actions by the statute of this state is ten years (Washington v. Norwood, 128 Ala. 383, 30 South. 405); that the statute, by its terms, applies to suits in chancery as well; that complainants have brought their suit within the statutory period, and the federal court sitting in this state is bound by the statute, or, if not bound, ought to follow the decision cited, construing the state statute, which gives complainants the full statutory period in which to sue, to establish a constructive trust, and regain possession of the lands from the purchaser mala fide. As supporting this contention, they cite Bryan v. Kales, 134 U. S. 126, 10 Sup. Ct. 435, 33 L. Ed. 829. There are two sufficient answers to this contention. The Supreme Court of this state has never construed these statutes to abolish the doctrine of laches where the owner of lands, who has been defrauded into making a conveyance and seeks to recover possession, has failed to make his election to avoid the transaction in a reasonable time after he discovers, or should have discovered, the fraud; nor has it held that the owner of lands who knows that another is in possession, improving the prop-

erty, under a deed or contract of sale made by the principal's apparent authority, may wait for the whole statutory period to eject the purchaser, regardless of the plaintiff's laches. James v. James, 55 Ala. 525; A. G. S. R. R. Co. v. S. & N. A. R. R. Co., 84 Ala. 579, 3 South. 286, 5 Am. St. Rep. 401. So, if this court were bound by the Alabama statute in the application of laches to a purely equitable remedy, the state decisions show that the complainants' contention cannot be maintained. If, however, the Supreme Court of this state had construed the statute otherwise, this court could not follow it. This is not a case of concurrent jurisdiction. The relief sought is not within the power of a court of law. It can be had only in equity. The fundamental doctrines upon which courts of the United States administer equity must be the same in every state, and cannot be changed by state statutes. Kirby v. Lakeshore R. R. Co., 120 U. S. 138, 7 Sup. Ct. 430, 30 L. Ed. 569. It has often been held that "the period of limitation in equitable actions fixed by the statute is not, where a purely equitable remedy is invoked, equivalent to a legislative direction that no period short of that time shall be a bar to relief in any case, or preclude the court from denying relief, in accordance with equitable principles, for unreasonable delay, although the full period fixed by the statute has not elapsed since the cause of action accrued." Calhoun v. Millard, 121 N. Y. 69, 24 N. E. 27, 8 L. R. A. 248; Beach's Mod. Eq. Jur. § 20. See Pomeroy's Eq. Jur. §§ 817, 818, 819, which are cited with approval in Hanner v. Moulton, 138 U. S. 491, 11 Sup. Ct. 408, 34 L. Ed. 1032. Bryan v. Kales, supra, is wholly unlike this case in principle. Bryan was indebted in his life to Kales, who administered Bryan's estate. Although Kales had sufficient funds to pay the debt, he procured a judgment in favor of himself as an individual, against himself as administrator, and had the property sold. "All the purchasers had full notice when they made their respective purchases." About four years afterwards, Bryan's wife, who was his sole heir, conveyed all her interest to plaintiff, who filed his bill to set aside the sale and divest the title of the purchasers. The court below dismissed the bill on demurrer, because she "stood by for nearly four years, saw the property enhancing in value, and sold time and again, without asserting any interest in it." The Supreme Court held that no such presumptions were justified from the fact that Mrs. Bryan's residence at the time of her husband's death was in the county where the real estate was situated. The defendants relied upon no act or transaction with the widow. They had no conveyance made in her name, and purporting to be made by her authority. She is not shown to have received any benefit from the sale. She was not shown to have remained in the county after her husband's death, or to have known anything about the fluctuations in the value of the property sold, or that it had been resold. Under circumstances "so peculiar in character," the Supreme Court held that it would not deny "relief upon the mere ground of laches in bringing the suit," when brought within the statutory period. The court reiterated in that case the rule so often enforced by the Supreme Court of the United States—that a court of equity may deny relief because of laches in suing, although the

plaintiff commenced his action within the period limited by the statute, according to the special circumstances of each case. Lansdale v. Smith, 106 U. S. 391, 1 Sup. Ct. 350, 27 L. Ed. 219; Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718; Hayward v. National Bank, 96 U. S. 611, 24 L. Ed. 855; Godden v. Kimmell, 99 U. S. 202, 25 L. Ed. 431. The facts set forth in the bill make a prima facie case of inexcusable inactivity, and plainly call upon defendants to excuse their long delay in seeking the aid of the court.

Complainants' excuse for their delay, to use their own language, is "that all the acts and doings of said defendants, and the real truth pertaining to said conveyances and the fraud and deceit practiced, were unknown to the complainants until within the last three months, and that since being informed they have been guilty of no delay in taking the proceedings set forth to obtain their rights." This is a very cautious statement. It gives the court little information as to the nature, time, or extent of complainants' ignorance. They say they did not know of "all the acts and doings" and "the real truth" pertaining to "said conveyances and the fraud practiced." They thus admit that they did know some of the "acts and doings" or some of "the real truth." Of what parts of "the real truth" were they in ignorance, and for how long before the filing of their bill? When did they first acquire knowledge of the acts of which they do not claim ignorance so recent as "within the last three months?" What led to the discovery of the fraud? The bill nowhere answers these questions. It is not claimed that the defendants failed to give published notice of the stockholders' meeting of the Land Company, or ever took any steps to conceal what its minutes showed as to their action on the Ensley Company's proposition, or as to the creation of the trust in Barker and Bowron, or as to any of the deeds by which the purchasers went into open, adverse possession, or by which the legal title was divested out of the Land Company. The bill shows that some of these deeds were recorded, and the presumption from its silence is that the others were also recorded. All these things were very openly and publicly done. The gravamen of the deceit charged is that the defendants, to carry out a secret plot of more than one year's duration, which culminated in the sale of 240 acres, made prior statements with the intent to deceive as to their motives and purposes, and kept from the stockholders' meeting, at the time it authorized the sale to the Ensley Company, the fact that the defendants were interested in it, and also failed to disclose, as they were under duty to do, the fact that "the large steel plant" would be speedily constructed. It is not alleged that the defendants have done anything since the meeting in 1898 to conceal their relations to the sale or the evidences of it. The first step in the fraud charged was that two of the defendants, after they had bought the Warner judgment, needlessly procured the enforcement of it by execution sale at a time when it could have been avoided by applying for aid to the Tennessee Company. This was in 1897. Inquiry of the Tennessee Company within one or two years thereafter would have informed the complainants whether the Tennessee Company would then have come to the rescue. The next concealment charged is of the fact

that the Tennessee Company contemplated the building of the steel plant before the meeting in 1898, and that defendants were interested in the purchase. The building of the steel plant, as we must presume from the recitals in the bill, took place shortly after the meeting which authorized the sale to the Ensley Company, and pertinently suggested the inquiry, in view of the rapid rise in the values of property thereafter, whether the erection of the steel plant had been known or mentioned in fixing the price of the land sold to the officers of complainants' corporation, and, if not, why not? Such inquiry would have shown whether the fact had been concealed or suppressed. The corporate minutes of the meeting in 1898, to which the complainants had the right of access, which it is not shown they ever attempted to exercise, would have told of the details of the corporate transaction which led to the conveyances to Barker and Bowron, and the divestiture of the title out of the Land Company, and into the trustees and into the purchasers, and, coupled with the erection of the steel plant shortly afterwards, would have informed the complainants that the Ensley Company profited by the rapid rise in the value of the property sold shortly before, and would have sharply suggested inquiry as to who composed the latter company. A perusal of the incorporation proceedings of the Ensley Company, which, if it were a corporation, as stated, must be found in the probate judge's office at Birmingham, a few miles distant from Ensley, would have shown that one of the incorporators was a son of the president of the Land Company, and who the other incorporators were, and thus afforded easy means of ascertaining their relations to the other defendants, as well as the important fact that it was incorporated to take over the lands sold under the Warner judgment.

The facts alleged as to the misstatements and the doings of the defendants before the sale, and their silence and concealment at the time of the sale, excused the failure to discover the motives and interest of the defendants while they were developing the transactions complained of, and for a reasonable time thereafter. The law is more liberal as to the period for discovery in the case of actual fraud than in a case involving mere constructive breaches of duty. Complainants do not aver that they ever heard, until recently, of any of the misrepresentations made prior to the sale, or of the concealment made at the time, or that they were thereby lulled into security or prevented from making earlier inquiry. For aught that appears, complainants learned of the secret purposes of the defendants, and their silence and failure to make disclosures at the time of the sale, long afterwards, when the complainants were put upon inquiry as to the bona fides of the sale by the open and notorious facts of the case. These things do not excuse complainants' supineness and long delay after the mask had been definitely thrown off, and the fact proclaimed by notorious, adverse possession, openly taken in the face of the multitude, under deeds which were spread upon the public records. Quite true it is that one is not ordinarily bound to suspect his trustee, and may presume, without inquiry, until he is advised to the contrary, that his trustee is acting fairly; but the right to rely upon this presumption is destroyed when the cestui que trust is warned by

actual knowledge, or, what is the same thing, fair and aggressive notice, that the trustee is faithless to his duty, and is himself assailing his trust. A cestui que trust is then bound to make seasonable inquiry, and to act promptly, if he wishes to rescind contracts such as those here involved, and when he, or the person through whom he claims, has been lured into them by reliance on the good .faith of his trustee. Whatever may have been the extent of complainants' knowledge, or whether or not they were charged, in the absence of subsequent developments, with notice of anything which appeared upon the minutes of the annual meeting of the stockholders, at which they did not attend, or of the public records of Jefferson county, the open and notorious adverse possession by the Ensley Company and McCormack and Ramsay of the original town site of the Land Company at Ensley, beginning in 1898, conclusively charged complainants, for aught that appears here, with notice of the adverse possession, and of the contracts and conveyances under which it was derived. What was being done at Ensley by the new purchasers was a matter of common knowledge in Birmingham and the surrounding towns. It occurred in a section of this state whose rapid development was then attracting the attention of large commercial centers like New York and elsewhere. The erection of a large steel plant at Ensley was regarded at home and abroad as marking a great epoch of advance in Southern industries, and was widely heralded in the press of the country. The four years elapsing between the date of the sale and the bringing of this suit witnessed the rise of a flourishing town of over 10,000 inhabitants on the very site of the Land Company's prior fruitless and long-continued endeavor to found a town. Complainants were stockholders before and during the time of the transactions complained of, and have been ever since. Whether they ever attended stockholders' meetings or made any inquiry to learn anything of the affairs of their corporation is not shown. The presumption is, it not being shown to the contrary, that there were annual meetings of the stockholders, for the law required them to be held. One of the complainants had scaled his original stock—at what time is not shown—at the rate of twenty shares of the old for one of the new. It would be strange if he did not then inquire what conditions made this scaling advisable. It is incredible, in the absence of excuse tendered, that complainants did not make inquiry after January, 1898, as to what had become of the Ensley Land Company, and what were its prospects. The Tennessee Company, which organized the Land Company, and all the while owned over half its stock, had an office in the city of New York, in which state, and, for aught that appears to the contrary, in which city, complainants resided. A personal visit to that office, or even a letter addressed to it there, would doubtless have enlightened the complainants as to the sales in 1898, even if they did not choose to make inquiry at the home office of the Land Company or from other sources there. Complainants do not show that they ever made any inquiry anywhere "until within the last three months." The slightest perusal of the conveyances made of the property of complainants' corporation prior to the sale, and of the minutes of the cor-

porate meeting at which this sale was authorized, and the subsequent conveyances, would quickly have led up to knowledge of the constructive fraud, and knowledge of that would have provoked inquiry, which, if followed up within any reasonable time, would have inevitably informed complainants of the grievances now set forth at least two or three years before the bill was filed. The court cannot entertain this bill unless it repudiates the equity maxim that "nothing can call forth this court into activity but conscience, good faith, and reasonable diligence."

The language of the excuse here set up is almost identical in terms with that condemned in Wood v. Carpenter, 101 U. S. 140, 25 L. Ed. 807. The excuse there was that the plaintiff "had no knowledge of the facts concealed by the defendant until the year A. D. 1872, and a few weeks only before the bringing of this suit." Here, as the court remarked there, "there is nothing further upon the subject." The common language of the books is that general allegations of ignorance at one time, and knowledge at another, is of no effect. "If the plaintiff made any particular discovery, it should be stated when it was made, what it was, and how it was made, and why it was not made sooner. There must be reasonable diligence, and means of knowledge is the same thing in effect as knowledge itself." The delay which has occurred must be shown to be consistent with the requisite diligence. Badger v. Badger, 2 Wall. 87, 17 L. Ed. 836; Harwood v. R. R. Co., 17 Wall. 78, 21 L. Ed. 558; New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820; Hardt v. Heidweyer, 152 U. S. 547, 14 Sup. Ct. 671, 38 L. Ed. 548; Otis v. Dargan, 53 Ala. 178; Wood v. Carpenter, 101 U. S. 140, 25 L. Ed. 807. In Broderick's Will Case, 21 Wall. 519, 22 L. Ed. 599, the Supreme Court, in speaking of persons who sought to vacate the probate of a will, and excused delay on account of absence from the country and ignorance of the fraud, said:

"Parties cannot thus, by their seclusion from the means of information, claim exemption from the laws that control human affairs, and set up a right to open up all the transactions of the past. The world must move on, and those who claim an interest in persons or things must be charged with knowledge of their status and condition, and of the vicissitudes to which they are subject."

Counsel is mistaken in supposing that the strictness of discovery required in Wood v. Carpenter, 101 U. S. 140, 25 L. Ed. 807, is applied only in actions for relief on the ground of fraud after the statute of limitations has barred the right. It is declared in that very case, and numerous others, that the strictness required as to discovery is "only the application to cases at law of principles which have always been acted upon in courts of equity." Equity always charges the conscience of the defrauded party who desires to rescind because he has been induced to part with his title by fraud, whether actual or constructive, with the duty not to speculate upon his adversary, and in a reasonable time after discovery to elect whether he will stand by his bargain or rescind it. He has no option to wait an unreasonable time after knowledge or fair notice, to determine whether he will take the profit or let the loss fall upon the purchaser, as may suit

his own wishes or interests. This rule of conduct is more strictly enforced regarding lands and property upon which improvements are being made, under conditions involving rapid fluctuations in value—as where a new town is being built, a mine is being opened, and the like—than as regards other property of essentially a different nature, under ordinary conditions, especially where the contracts require the assumption of heavy liabilities or entail large expenditures on the part of the vendee. In such cases it is the duty of the defrauded party to speak and act promptly after knowledge or notice of the fraud, and the failure to do so debars him of all right to equitable relief. Equity will not help the party who thus unreasonably delays, but leaves him to pursue his remedies at law. It will be remembered that one of the propositions made by the Ensley Company to the Ensley Land Company, and which the latter recommended the trustees to accept, was that the Land Company should name "a price on each lot or block it was willing to put on the market," and give the Ensley Company "the exclusive right to sell the same, paying us [the Ensley Company] ten per cent. commission on all sales, and when the lands are sold on time or in connection with our building operations, we to pay the fixed price ourselves, less the ten per cent. commission," etc. The facts stated in the bill, taken in connection with other facts of which the court must take judicial notice, present a case where the skill, energy, and means of the defendants have for years been directed, without dissent from any quarter, to the building up of a flourishing manufacturing town on the very lands now sought to be recovered. Equity will not allow the former owner, though defrauded in the sale, to lay quietly by, indefinitely, after seasonable knowledge or notice of the fraud, seeing the purchasers expending their money and time in improving the value of the property, and then give him its aid, when he suddenly acquaints them that he objects, to repossess himself of the property or profits. Ashurst's Appeal, 60 Pa. 37; Twinlick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328; Johnston v. Standard Mining Co., 148 U. S. 360, 13 Sup. Ct. 585, 37 L. Ed. 480; Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738; Sheffield Land Co. v. Neill, 87 Ala. 158, 6 South. 1; Gilmer v. Morris, 80 Ala. 78, 60 Am. Rep. 85; Zabriskie v. C. & C. R. R. Co., 23 How. 387, 16 L. Ed. 488; Kent v. Quicksilver Mining Co., 78 N. Y. 159; A. G. S. R. R. Co. v. S. & N. A. R. R. Co., 84 Ala. 579, 3 South. 286, 5 Am. St. Rep. 401. It may or may not be, as argued for complainants, that the Land Company, though not now in a position which entitles it to the aid of a court of equity to compel a reconveyance of the land or to disturb the purchaser's possession, is nevertheless entitled to personal recourse against the defendants "for the damage and loss which the Ensley Land Company and stockholders have suffered by reason of the transactions complained of," etc. Such relief, however, is merely incidental to the equitable cause of action, and when that fails the bill should not be retained to administer relief which is merely incidental, and ordinarily a matter purely of legal cognizance.

The demurrers are sustained, and the cost decreed against complainants. If the complainants desire to amend, they may apply for

leave under the thirty-fifth rule in equity within 40 days. If amendment is not allowed within that time, final decree will then be rendered dismissing the bill as to all the defendants, but without prejudice to the right of the Ensley Land Company or complainants to maintain such actions at law as they may be advised. The Land Company is a nominal defendant, and has not demurred, but answered. It is, however, the real complainant. If its answer could be looked to, it gives no support to the equity of the bill. It would be an idle ceremony to proceed with the case between it and the complainants, since the ruling on demurrer establishes there can be no decree in its favor, and no relief is sought against it.